# United States District Court

FOR THE
**NORTHERN DISTRICT OF CALIFORNIA**

VENUE: SAN FRANCISCO

---

UNITED STATES OF AMERICA,

V.

CR18-0021 CRB

Robert Bogucki,

DEFENDANT(S).

---

## SUPERSEDING INDICTMENT

18 U.S.C. § 1349 - Conspiracy to Commit Wire Fraud Affecting a Financial Institution;
18 U.S.C. § 1343 - Wire Fraud Affecting a Financial Institution;
18 U.S.C. § 2 - Aiding, Abetting, and Willfully Causing;
18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 - Criminal Forfeiture

---

A true bill.

_____ Foreman

Filed in open court this 27th day of March 2018.

Ada Means   Clerk

NO PROCESS

Bail, $ _____

Jacqueline Scott Corley
United States Magistrate Judge

FILED 2018 MAR 27 P 1:46
SUSAN Y. SOONG
CLERK, US DISTRICT COURT
NO. DIST. OF CA.

AO 257 (Rev. 6/78)

| DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT |
|---|

BY: ☐ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT  ☒ SUPERSEDING

**OFFENSE CHARGED**

18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud Affecting a Financial Institution;
18 U.S.C. § 1343: Wire Fraud Affecting a Financial Institution;
18 U.S.C. § 2: Aiding, Abetting, and Willfully Causing;
18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461: Criminal Forfeiture

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

PENALTY: Per count:
30 years imprisonment; 5 years supervised release; $1,000,000 fine.

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

**DEFENDANT - U.S**

▶ Robert Bogucki

DISTRICT COURT NUMBER
CR 18-00021 CRB

FILED MAR 27 2018
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**PROCEEDING**

Name of Complaintant Agency, or Person (& Title, if any)
Federal Deposit Insurance Corporation - Inspector General

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
   ☐ U.S. ATTORNEY  ☐ DEFENSE

SHOW DOCKET NO.
18-CR-00021

☒ this prosecution relates to a pending case involving this same defendant

MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person Furnishing Information on this form   Justin Weitz - U.S. D.O.J.
☐ U.S. Attorney  ☒ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   ROBERT S. LEACH

**DEFENDANT**

**IS NOT IN CUSTODY**
1) ☐ Has not been arrested, pending outcome this proceeding.
   If not detained give date any prior summons was served on above charges ▶
2) ☐ Is a Fugitive
3) ☒ Is on Bail or Release from (show District)
   Northern District of California

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction  } ☐ Federal  ☐ State
6) ☐ Awaiting trial on other charges
   If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No  } If "Yes" give date filed

DATE OF ARREST ▶ Month/Day/Year

Or... if Arresting Agency & Warrant were not
DATE TRANSFERRED TO U.S. CUSTODY ▶ Month/Day/Year

☐ This report amends AO 257 previously submitted

**ADDITIONAL INFORMATION OR COMMENTS**

PROCESS:
☐ SUMMONS  ☒ NO PROCESS*  ☐ WARRANT
If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance
Defendant Address:

Bail Amount:

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:                Before Judge:

Comments:

ALEX G. TSE (CABN 152348)
Acting United States Attorney



FILED
2018 MAR 27 P 1:46
SUSAN Y. SOONG
CLERK, US DISTRICT COURT
NO. DIST. OF CA.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | ) Case No. CR 18-00021 CRB |
|---|---|
| Plaintiff, | ) |
| | ) VIOLATIONS: 18 U.S.C. § 1349 – |
| v. | ) Conspiracy to Commit Wire Fraud |
| | ) Affecting a Financial Institution; |
| ROBERT BOGUCKI, | ) 18 U.S.C. §§ 1343 & 2 – Wire Fraud |
| | ) Affecting a Financial Institution; |
| Defendant. | ) 18 U.S.C. §§ 981(a)(1)(C) & 982(a) & |
| | ) 28 U.S.C. § 2461 – Criminal Forfeiture |
| | ) |
| | ) SAN FRANCISCO VENUE |

SUPERSEDING INDICTMENT

The Grand Jury alleges:

I.      The Co-Conspirators and Relevant Entities

At all times relevant to the Superseding Indictment:

1.      Barclays PLC was one of the largest banking and financial services institutions in the world. Barclays Capital, Inc. was a subsidiary of Barclays Bank PLC, which was a wholly-owned subsidiary of Barclays PLC. "Barclays" refers collectively to Barclays PLC, the New York and London branches of Barclays PLC, Barclays Bank PLC, and Barclays Capital, Inc. Barclays PLC and Barclays Bank PLC were financial institutions within the definition of 18 U.S.C. § 20.

2.      Beginning in 2008, the defendant, ROBERT BOGUCKI, a/k/a Robert H. Bogucki, Jr., a citizen of the United States and resident of New York, New York, was a foreign exchange ("FX") trader

SUPERSEDING INDICTMENT
CR 18-00021 CRB                                1

at the New York branch of Barclays. In 2011, BOGUCKI was the head of Barclays' FX trading in New York, and supervised other FX traders at Barclays. Over 80% of BOGUCKI's 2011 compensation resulted from bonuses for performance.

3. Beginning in 2007, Co-Conspirator 1 ("CC-1"), a citizen of the United Kingdom and resident of London, England whose identity is known to the Grand Jury, was an FX trader at the London branch of Barclays. In 2011, CC-1 was a senior FX trader at Barclays in London, and supervised other FX traders at Barclays. Over 80% of CC-1's 2011 compensation resulted from bonuses for performance.

4. The Hewlett-Packard Company ("HP") was a publicly traded technology services company. Person 1 and Person 2, whose identities are known to the Grand Jury, were HP employees, and were responsible for managing foreign currency transactions on behalf of HP. Both Person 1 and Person 2 worked at HP's primary place of business, which was located in Palo Alto, California.

II. Relevant Definitions

5. The "FX market" enables participants to buy, sell, exchange, and speculate on currencies. Participants in the FX market include financial institutions, central banks, hedge funds, investment management firms, corporations, and individuals, among others.

6. An "FX spot transaction" involves the exchange of a given amount of one currency, such as the U.S. Dollar ("USD" or "Dollar") for the equivalent amount of another currency, such as the British Pound ("GBP," "Sterling," or "Pound," often noted using the "£" symbol), at an agreed-upon price.

7. A "currency pair" is the relation of two traded currencies to one another. The first currency of a currency pair is called the "base" currency, and the second currency is called the "quote" currency. For example, one currency pair is GBP/USD, or Sterling/Dollar. An order to buy GBP/USD is an order to buy the base currency (GBP) using the quote currency (USD) to pay for the transaction. An order to sell GBP/USD is an order to sell the base currency (GBP) and to receive the quote currency (USD). For example, GBP/USD 1.6564 means that one Pound could be exchanged for 1.6564 U.S. Dollars.

8. An "FX option" is a contract which grants the holder the right, but not the obligation, to buy or sell a specified currency at a specified exchange rate ("strike price") on or before a specified date ("expiration date").

9. "Cable options" is a term used to refer to FX options in which the United States Dollar and

SUPERSEDING INDICTMENT
CR 18-00021 CRB                                2

the British Pound form the currency pair.

10. FX options are valued using a number of criteria. These include fixed criteria such as the expiration date on the option and the strike price. These also include variable criteria such as "volatility" and the value of the currency in the FX spot market.

11. "Volatility" is a term that reflects the amount of uncertainty or risk involved with ownership of an FX option. When volatility is at a higher price level, the value of an FX option generally increases. When volatility is at a lower price level, the value of an FX option generally decreases.

12. The "Bloomberg volatility" is a statistic, determined by the Bloomberg financial information service, that measures the price of volatility for certain options at various times. The Bloomberg volatility is visible to entities that subscribe to the Bloomberg information service.

13. "Financial Institution A" and "Financial Institution B," whose identities are known to the Grand Jury, were financial institutions within the definition of 18 U.S.C. § 20, and participated in the FX market.

III. The Scheme to Defraud

14. From at least in or about August 2011 and continuing until at least in or about October 2011, the defendant ROBERT BOGUCKI and CC-1, together with others known and unknown to the Grand Jury, devised and executed a scheme to defraud HP of money and property.

15. The purpose of the scheme to defraud was to enrich Barclays, to benefit the members of the conspiracy, and to conceal the existence of the scheme.

16. In furtherance of the scheme to defraud HP and to effect the objectives thereof, BOGUCKI and his co-conspirators used the following methods and means, among others:

   a. Misappropriating HP's confidential information (namely, knowledge that HP intended to sell a large quantity of cable options in September and October 2011) in violation of a duty of trust and confidence that Barclays, BOGUCKI, CC-1, and other agents of Barclays owed to HP by using HP's confidential information, to HP's detriment, to engage in trading activity calculated to reduce the value of the options that HP planned to sell to Barclays;

   b. Making, and causing to be made, false, fraudulent, and misleading material misrepresentations, omissions, and half-truths to HP regarding the role that Barclays and its agents played

in devaluing HP's options and the trading positions that Barclays had taken between September 27, 2011 and October 4, 2011; and

   c. Depriving HP of its right to control its money and property by (i) concealing their plan to depress the value of HP's options; (ii) making false statements about the manner in which Barclays traded FX between September 27, 2011 and October 4, 2011; (iii) advising HP to delay the sale of its options so as to provide the members of the conspiracy with additional time to manipulate the FX market in Barclays' favor; (iv) providing HP with false, deceptive, and intentionally misleading explanations as to why HP's options declined in value just before Barclays acquired them; and (v) falsely promising HP they would maintain the confidentiality of its information.

  A. <u>HP Acquires Autonomy</u>

  17. In or about 2011, HP negotiated to acquire Autonomy Corporation PLC ("Autonomy"), which was an entity engaged in computer software development and distribution. Autonomy maintained dual headquarters in San Francisco, California, and Cambridge, United Kingdom. HP engaged Barclays to provide it with financial advisory services in connection with the contemplated acquisition of Autonomy.

  18. United Kingdom government regulations require that a foreign entity seeking to acquire a British company have access to sufficient pounds to complete the transaction. Accordingly, before publicly announcing its intent to acquire Autonomy, HP had to ensure that it had ready access to several billion pounds.

  19. In or about August 2011, representatives of HP consulted with representatives of Barclays concerning methods to satisfy this requirement, including through different types of FX transactions.

  20. There are several ways that a United States entity can gain access to pounds. An entity can exchange dollars for pounds by purchasing pounds at a specific exchange rate in an FX spot transaction. Alternatively, an entity can purchase cable options, which offer the right to exchange dollars for pounds at a pre-determined, fixed cost. Since FX options do not require the entity to actually purchase pounds, but instead give the entity the ability to do so if it chooses, FX options allow an entity to maintain maximum flexibility.

  21. In consultation with Barclays, HP determined that it would purchase approximately £6

billion worth of cable options from Barclays. These options would provide HP with the right to exchange dollars for £6 billion at a pre-determined, fixed cost.

22. In August 2011, HP engaged Barclays to assist it in purchasing £6 billion worth of cable options in advance of the public announcement of HP's planned acquisition of Autonomy. Barclays sold HP £6 billion worth of cable options with an expiration date in February 2012.

23. Barclays received compensation for its involvement in HP's August 2011 purchase of cable options.

24. On or about August 18, 2011, HP publicly announced its intention to acquire Autonomy for approximately $10.3 billion.

25. In or about September 2011, HP determined it no longer needed the options, and would not use them as part of the acquisition of Autonomy. HP decided to "unwind" the cable options by selling them back in the FX market in several increments, or "tranches." HP's representatives engaged in discussions with Barclays about selling the cable options back to Barclays.

B. <u>Barclays' Obligations to HP</u>

26. Barclays and its agents, including BOGUCKI and CC-1, owed HP a duty of trust, confidence, honesty, and disclosure.

27. Barclays and its employees undertook a duty to keep confidential information provided by HP. On or about August 17, 2011, Barclays and HP executed a confidentiality agreement governing HP's acquisition of Autonomy, in which Barclays undertook to keep HP's information confidential and "only use the Confidential Information with respect to providing financial advisory services to the Company." Barclays and its employees represented to HP that they would maintain the confidentiality of information regarding HP's plan to unwind the options because public dissemination of this information could result in trading by other market participants, and cause HP's options to decline in value.

28. Accordingly, on or about September 27, 2011, BOGUCKI promised representatives of HP that "this will be kept very quiet" and stated that a breach of HP's expectation of confidentiality would be "a fire-able offense."

29. In the course of the discussions concerning whether HP would award the unwind to Barclays, Barclays employees made representations to HP about acting in HP's "best interest."

Specifically, on or about September 27, 2011, BOGUCKI advised representatives of HP that it would be in their "best interest" to trade on specific days and promised that he and Barclays "[would] go to the mat" to obtain a favorable price for HP on the unwind. During this same conversation, Person 1 advised BOGUCKI that HP was "asking for a pretty trust-type exit because I think you'll treat us fair," to which BOGUCKI responded "yep, and I'll try to step up as much as I possibly can for that."

C. <u>Execution of the Scheme to Defraud</u>

30. On September 8, 2011, BOGUCKI spoke with Person 1, and discussed the mechanics and pricing of HP's planned unwind of the cable options.

31. At or around 7:35 a.m. Pacific Time on or about September 27, 2011, BOGUCKI engaged in a telephone conversation with Person 1 and Person 2. BOGUCKI told HP's representatives that the conditions in the market were not ideal for HP to immediately unwind £2 billion worth of cable options.

32. During that telephone conversation, BOGUCKI informed HP's representatives that Barclays FX traders were "not touching the market" and were "not doing anything," when in fact BOGUCKI intended for Barclays to engage in FX trading calculated to depress the value of HP's cable options.

33. Having promised HP that Barclays FX traders were "not touching the market," at or around 8:25 a.m. Pacific Time on or about September 27, 2011, BOGUCKI and CC-1 held a telephone conversation during which BOGUCKI declared that "we need to figure out what to do with this information" (i.e., the information conveyed to Barclays by HP several minutes earlier). CC-1 noted that "it would be nice to short, short ahead of" the planned unwind. BOGUCKI and CC-1 agreed to sell options, so as to affect the value of cable option volatility and depress the value of HP's cable options.

34. During the conversation referenced in paragraph 32 above, BOGUCKI derided Person 1 as "the kiddie" who is "playing a little poker here" and remarked to CC-1 that Person 1's suggestion that HP was prepared to trade that day was "fucking scary."

35. On or about September 27 and 28, 2011, BOGUCKI and CC-1's subordinate traders sold FX options to ensure that Barclays maintained a "short" position with respect to cable, i.e., that Barclays had negative net ownership of cable options.

36. At or around 6:30 a.m. Pacific Time on or about September 28, 2011, BOGUCKI engaged

in a telephone conversation with Person 1 and Person 2 during which BOGUCKI observed that volatility for cable options had fallen. During this conversation BOGUCKI attributed the fall in volatility to a lack of "resolution in Europe" and a "stock market rally" but omitted and concealed the fact that Barclays had been placing trades calculated to depress the price of cable option volatility.

37. On or about September 28, 2011, at BOGUCKI's direction, Barclays FX traders executed the first tranche of the unwind by purchasing £2 billion in cable options from HP.

38. On or about September 29, 2011, in anticipation of the second tranche of the unwind, CC-1 instructed Barclays FX traders in an electronic chat to sell cable options in a way that would further depress the price of cable option volatility. Specifically, at or around 4:20 a.m. Pacific Time, CC-1 told Barclays FX traders that "tomorrow m[or]ning, sell a[g]gressively ahead of [the] next tranche." During this chat exchange, CC-2, who was an FX options trader employed by Barclays and whose identity is known to the Grand Jury, suggested to other Barclays traders, including CC-1, to "HAMMER THE MKT [market] LOWER."

39. From on or about September 29, 2011 through on or about September 30, 2011, Barclays FX traders sold large amounts of cable options, reducing Barclays' inventory of cable options to a "short" position and depressing the price of cable option volatility.

40. During a telephone call at or around 6:14 a.m. Pacific Time on or about September 29, 2011, CC-1 advised BOGUCKI that he intended to continue selling cable options in front of the next tranche: "I was going to call out tomorrow morning and basically bash the shit out of this again." BOGUCKI then informed CC-1 that he cautioned another Barclays trader to be discreet in order to avoid the attention of senior executives at Barclays: "if it gets back to HP by some loose lipped market monger [] that we're selling cable off of them or we're getting out of a six yard option (i.e., a £6 billion option) over the course of a week it will go straight to [the head of Barclays' United States operations] and your ass will be in a fucking frying pan in November."

41. During an electronic chat at or around 6:15 a.m. Pacific Time on or about September 29, 2011, BOGUCKI advised Person 1 that Barclays was "long" on cable options when he then and there well knew that Barclays was in fact "short" on cable options (i.e., Barclays had taken a net negative position). During this chat, BOGUCKI attributed the decline in volatility to an "equity rally" but did not disclose

that Barclays had been trading in a manner calculated to depress volatility.

42. During a telephone call beginning at or around 6:43 a.m. Pacific Time on or about September 29, 2011, BOGUCKI instructed CC-1 to continue placing trades calculated to depress volatility: "you know you should like offer this fucking shit down," to which CC-1 responded "okay fine."

43. During a telephone call beginning at or around 7:19 a.m. Pacific Time on or about September 29, 2011, CC-1 advised BOGUCKI that "tomorrow morning we were going to call out and just spank the market like good and proper. Right, so we'd be [better on] the second clip (i.e., tranche)."

44. During an electronic chat at or around 7:28 a.m. Pacific Time on or about September 29, 2011, BOGUCKI advised Person 1 to wait to execute the next tranche of the unwind, which had the effect of providing Barclays with additional time to manipulate the cable options market.

45. During an electronic chat at or around 7:38 a.m. Pacific Time on or about September 29, 2011, CC-1 advised other Barclays traders that "we need to sell a[g]gressively between now and tomorrow . . . tom[orrow] mng we call out and sell shedloads" (*sic*).

46. On or about September 30, 2011, CC-1 and Barclays FX traders, at BOGUCKI's direction, sold FX options, thereby depressing the price of volatility and diminishing the value of HP's options.

47. During a telephone call at or around 3:41 a.m. Pacific Time on or about September 30, 2011, BOGUCKI and CC-1 agreed to lie to representatives of HP by stating that the decline in the price of volatility had been caused by other banks' activity in the market, in order to conceal the scheme. BOGUCKI cautioned CC-1 that if asked why the price of volatility had declined, "you and me need to independently stick to the story of . . . we haven't been offering the cable curve, other banks have."

48. During a telephone call at or around 7:29 a.m. Pacific Time on or about September 30, 2011, Person 1 observed that the price of volatility had fallen and asked CC-1, "so, what did you guys do this morning that like caused it to dive like it did?" CC-1 represented to Person 1 that the decline in volatility was caused by other banks' activity in the market but concealed the fact that Barclays had been trading in a manner calculated to depress volatility.

49. On this same call, in response to a question from Person 2, CC-1 stated that Barclays had sold "four-fifths" of HP's first tranche. CC-1 failed to mention that Barclays had sold other options, and that Barclays' selling had the effect of depressing the price of volatility.

SUPERSEDING INDICTMENT
CR 18-00021 CRB                              8

50.  During a telephone call at or around 8:52 a.m. Pacific Time on or about September 30, 2011, BOGUCKI and CC-1 acknowledged that the market had moved in a way that would harm HP. BOGUCKI told CC-1 that "I have to tell [Person 1] in a very nice way that instead of letting us fuck you for three or four million dollars, you perfectly supervised the market at large fucking you in the ass for 25, so congratulations." Asked by CC-1 to "say that again," BOGUCKI reiterated that "instead of allowing us to charge you four million dollars, you perfectly supervised the market at large fucking you for 25."

51.  During a telephone call at or around 10:36 a.m. Pacific Time on or about September 30, 2011, BOGUCKI told Person 1 that the stock market and other banks' activities were likely the causes of the decline in the price of volatility. BOGUCKI did not disclose the material fact that Barclays FX traders had manipulated the price of volatility to HP's detriment.

52.  On or about October 3, 2011, Barclays bought HP's remaining £4 billion worth of cable options.

53.  During a telephone call at or around 6:20 a.m. Pacific Time on or about October 3, 2011, BOGUCKI spoke with HP's representatives by telephone. BOGUCKI told Person 1 that BOGUCKI had "literally done everything on [his] end to tighten [the spread] to as tight as what everybody would be possibly comfortable with [at Barclays]." BOGUCKI did not disclose the material fact that Barclays FX traders had manipulated the price of volatility to HP's detriment.

54.  On or about October 4, 2011, after Barclays completed its purchase of the second tranche from HP, Person 1 asked BOGUCKI how Barclays was able to execute the transaction without "the market reacting in a panic" like it had before. Rather than disclosing that the price of volatility had not declined further because Barclays traders, having completed their purchases of options from HP, stopped manipulating the market, BOGUCKI stated that the unwind of the second tranche did not disrupt the market because Barclays could "lob out little pices throuygh our franchise and through the brokers and not have to run out and 'hit bids' and get aggressive with the market" (*sic*).

55.  The scheme led HP to lose millions of dollars in the value of the cable options it had originally purchased and enabled Barclays to make millions of dollars by acquiring the options from HP at a discounted and favorable price.

COUNT ONE:  (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud Affecting a Financial Institution)

56. The factual allegations in Paragraphs 1 through 55 are re-alleged and incorporated by reference.

57. From in or about August 2011 through in or about October 2011, in the Northern District of California and elsewhere, the defendant,

ROBERT BOGUCKI,

CC-1, CC-2, and others known and unknown to the Grand Jury, did knowingly conspire to devise and intend to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by omissions and concealment of material facts with a duty to disclose, and, for the purpose of executing such scheme and artifice and attempting to do so, to transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, all affecting a financial institution, to wit, Barclays PLC, Barclays Bank PLC, Financial Institution A, and Financial Institution B, in violation of Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

COUNTS TWO THROUGH SEVEN:  (18 U.S.C. §§ 1343 & 2 – Wire Fraud Affecting a Financial Institution and Aiding and Abetting)

58. The factual allegations in Paragraphs 1 through 55 are re-alleged and incorporated by reference.

59. From in or about August 2011 through in or about October 2011, in the Northern District of California and elsewhere, the defendant,

ROBERT BOGUCKI,

did knowingly, and with intent to defraud, devise and intend to devise, and willfully participate in, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by omissions and concealment of material facts with a duty to disclose, all affecting a financial institution, to wit, Barclays PLC, Barclays Bank PLC,

Financial Institution A, and Financial Institution B.

60. On or about the dates set forth below, in the Northern District of California and elsewhere, the defendant did, for the purpose of executing such scheme and artifice and attempting to do so, transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, to wit, the wire communications described below:

| Count | Date & Time | Description of Wire |
|---|---|---|
| Two | 9/27/2011 7:35AM PT | Telephone call between BOGUCKI in New York, New York and HP representatives in Palo Alto, California |
| Three | 9/28/2011 6:30AM PT | Telephone call between BOGUCKI in New York, New York and HP representatives in Palo Alto, California |
| Four | 9/29/2011 6:15AM PT | Bloomberg chat between BOGUCKI in New York, New York and HP representatives in Palo Alto, California |
| Five | 9/30/2011 10:36AM PT | Telephone call between BOGUCKI in New York, New York and Person 1 in Palo Alto, California |
| Six | 10/3/2011 6:20AM PT | Telephone call between BOGUCKI in New York, New York and HP representatives in Palo Alto, California |
| Seven | 10/4/2011 2:56PM PT | Bloomberg chat between BOGUCKI in New York, New York and Person 1 in Palo Alto, California |

Each in violation of Title 18, United States Code, Sections 1343 and 2.

<u>FORFEITURE ALLEGATIONS:</u>   (18 U.S.C. §§ 981(a)(1)(C) & 982(a) & 28 U.S.C. § 2461 – Criminal Forfeiture)

61. The allegations in Paragraphs 1 through 60 of this Superseding Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461.

62. Upon conviction of any of the offenses alleged in Counts One through Seven, the defendant,

ROBERT BOGUCKI,

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461, any property, real and personal, which constitutes

or is derived from proceeds traceable to said violations, including but not limited to the amount of proceeds obtained as a result of the offenses alleged in Counts One through Seven.

63. If, as a result of any act or omission of the defendant, any of said property

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to or deposited with a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

any and all interest defendant has in any other property shall be forfeited to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461.

In violation of Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461.

DATED: March 27, 2018

A TRUE BILL

_____
FOREPERSON

ALEX G. TSE
Acting United States Attorney

_____
JOHN H. HEMANN
Deputy Chief, Criminal Division

SANDRA MOSER
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice

Approved as to form:

_____
JUSTIN D. WEITZ
Trial Attorney
Criminal Division, U.S. Department of Justice

SUPERSEDING INDICTMENT
CR 18-00021 CRB                                                         12