IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  18-cr-00021-CRB-1 |
| Plaintiff, | |
| v. | **ORDER DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT** |
| ROBERT BOGUCKI, | |
| Defendant. | |

The government has charged Robert Bogucki, a trader at Barclays Bank, with wire fraud, alleging that Bogucki deceived Hewlett Packard ("HP") in a 2011 options trade. Bogucki moves to dismiss on the ground that the indictment is time-barred.  While the government returned the indictment outside the five-year statute of limitations normally applicable to wire fraud, it argues that it is nevertheless timely under a 10-year statute of limitations applicable to fraud that "affects a financial institution."  See 18 U.S.C. § 3293(2).  Bogucki counters that (1) the government has waived its right to rely on § 3293, and (2) § 3293 does not apply in any event because the alleged offense did not "affect[] a financial institution" within the meaning of that provision.  See § 3293.  He is wrong on both counts, so the Court must deny the motion to dismiss.

United States District Court
Northern District of California

# I.     BACKGROUND

## A.     Factual Background[1]

In late 2011, HP agreed to acquire Autonomy Corporation PLC ("Autonomy") for approximately $10.3 billion.  Superseding Indictment ("SI") (dkt. 1) at ¶¶ 17, 24. Autonomy was a British company, and was therefore governed by British regulations that require foreign entities seeking to acquire British companies to have access to sufficient funds, in pounds, to complete the transaction.  Id. ¶ 18.  Accordingly, in order to get British regulators to sign off on the deal, HP had to satisfy the regulators that it had ready access to several billion pounds.  Id.

HP could have accomplished this by simply acquiring pounds in what is known as a "spot transaction."  Id. ¶ 20.  Instead, it decided to purchase options to buy approximately £ 6 billion at a pre-determined, fixed cost (this is known as the "strike price").  Id. ¶¶ 20– 22.  This allowed HP to "hedge" against the possibility that the dollar would lose value relative to the pound between the date it had to certify to British regulators that it had the funds, and the date it had to actually transfer those funds to Autonomy.  In other words, it insulated HP from the risk that pounds would get more expensive in the meantime.  If the price of pounds rose above the strike price before the options expired, HP could save money by exercising its options.  See id. ¶ 8.  If the price of pounds did not rise above the strike price, on the other hand, HP could simply allow the options to expire.  See id. Alternatively, if it decided prior to the options' expiration dates that it would not need to use them, HP could sell them to another firm.  See id. ¶ 25.

HP chose this last course of action, deciding in September 2011 that it would not exercise the options.  Id. ¶ 25.  Instead, it decided to "unwind" the options by selling them back to Barclays, from whom it had originally purchased them, in several increments, or "tranches."  Id.

---

[1] Because this case comes before the Court on a motion to dismiss, the Court must assume that the facts in the indictment are true.  This order accordingly recounts the facts as stated in the superseding indictment.

United States District Court
Northern District of California

United States District Court
Northern District of California

Bogucki was one of several Barclays employees (among them an unindicted co-conspirator) who worked with HP to help it unwind the options.  Id. ¶¶ 2, 27.  Bogucki was the head of Barclays' foreign exchange ("FX") trading desk in New York.  Id. at ¶ 2.  In that role, he spoke with HP about the possibility that Barclays itself would purchase HP's options.  Though Barclays was negotiating to purchase the options from HP, this was, as the government describes it, something less than an arm's-length transaction: Barclays and its agents, Bogucki included, "owed HP a duty of trust, confidence, honesty, and disclosure," and Bogucki told HP that he would do all he could to obtain a favorable price for HP.[2]  Id. ¶¶ 26–29.

Nevertheless, the government alleges, Bogucki conspired with other Barclays traders to sell other options for British pounds prior to buying HP's options.  Id. ¶¶ 33, 35, 38–46.  The government states that these sales were calculated to lower the price of HP's options, enabling Barclays to obtain a more favorable price.

While the mechanics of this are not quite clear from the superseding indictment, the government's theory appears to be as follows.  Instead of simply negotiating a price for the options trade, Barclays and HP agreed ahead of time to base the price on a pre-set formula that incorporated only one uncertain variable: a measure of volatility in the FX market maintained by Bloomberg.  Id. ¶ 12.  Volatility is a measure of how much prices vary in a given market.  Mathematically, it represents the average deviation from the mean price.  A high-volatility stock varies widely in price over a given period of time, whereas a low-volatility stock varies little.  When volatility is high, an option is generally more valuable, because the chance that the option will need to be exercised increases.  Meanwhile, an

---

[2] While the government alleges that Bogucki had a fiduciary duty to HP in the unwind, it is unclear whether it will be able to establish this at trial, given that Barclays acted as the purchaser of the options—not, apparently, as HP's agent.  However, this is not necessarily fatal to the government's case: wire fraud may be based on an affirmative misrepresentation, and the government alleges several such misrepresentations here.  It is only where liability is based on an omission that the jury must find that a defendant had a duty to divulge the information.  United States v. Shields, 844 F.3d 819, 823 (9th Cir. 2016).  To be clear, the Court in this footnote is only engaging in some judicial head-scratching—it is not ruling on whether the government will be able to argue at trial that Bogucki had a fiduciary duty to HP, as the issue has not yet been briefed.

option is generally less valuable when volatility is low. This should make sense intuitively: markets with high volatility are more uncertain, so traders have more incentive to hedge.

Though the government does not say so explicitly in the indictment, it implies that the market price of FX options is one of the factors used by Bloomberg to calculate volatility in that market. In other words, in assessing volatility, Bloomberg apparently relies on the judgments of traders, as expressed in the prices of FX options. If the price of an option in that market (adjusted for strike price, expiration date, and the current exchange rate) is decreasing, then Bloomberg's measure of volatility will also decrease. Flooding the market with options will tend to decrease the price of those options. Thus, the alleged scheme to flood the FX market with new options ahead of the HP unwind would enable Barclays to obtain the HP options at a lower price than the options would otherwise have gone for.

Of course, a defendant does not commit wire fraud simply by trading. Wire fraud requires a misrepresentation (or an omission in the presence of a duty—see n.2). Here, the government alleges that Bogucki committed wire fraud by repeatedly telling HP that Barclays was not trading in the FX options market prior to purchasing HP's options, when in fact it was. Id. ¶¶ 33, 35, 36, 40, 41, 44, 47, 48, 49, 51, 53, 54, 58–60. Barclays and its employees had previously "represented to HP that they would maintain the confidentiality of information regarding HP's plan to unwind the options because public dissemination of this information could result in trading by other market participants, and cause HP's options to decline in value." Id. ¶ 27. The traders' scheme "enabled Barclays to make millions of dollars by acquiring the options from HP at a discounted and favorable price." Id. ¶ 55.

The government filed the initial indictment on Jan. 16, 2018, charging Bogucki with one count of conspiracy to commit wire fraud and six counts of the substantive offense of wire fraud. Id. at ¶¶ 55–59. Shortly thereafter, on Feb. 28, the Department of Justice agreed to close its investigation of Barclays (though not of Bogucki) in return for certain

conditions in a Declination Letter.  Declination Letter (dkt. 59-3) at 1.  The letter states: "The Department's investigation found that Barclays, through its employees and agents, misappropriated confidential information provided to Barclays by HP in regard to FX options and spot transactions, and deceived HP about its trading, in violation of its duties to HP, as described in the indictment returned in United States v. Bogucki, 18-CR-00021 (N.D. Cal.)."  Id.  In consideration for the government's agreement not to prosecute, Barclays pledged to "pay $12,896,011 USD in combined restitution and disgorgement . . . to the U.S. Treasury."  Id. at 2.

### B.    Procedural History

Bogucki brought a motion to dismiss the indictment on Feb. 14, 2018.  First Mot. to Dismiss (dkt. 27).  He urged the Court to dismiss on the ground that the government had failed to comply with the applicable five-year statute of limitations.  See 18 U.S.C. § 3282. The government had sought and obtained an order tolling the statute of limitations pursuant to 18 U.S.C. § 3292.  In re Grand Jury Investigation, No. 16-xr-90698-JST dkt. 2 (Aug. 3, 2016).  That statute provides for tolling "if the court finds by a preponderance of the evidence that an official request has been made for [foreign] evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country."  18 U.S.C. § 3292(a)(1).

The defense argued that the government had obtained the order in bad faith, contending that it (1) misled the tolling court about whether it reasonably appeared that evidence of the offense was in a foreign country, and (2) applied for the tolling order as a pretext to buy more time to prepare its case.  This Court found that the defense was entitled to an evidentiary hearing to inquire into the government's true motivations for obtaining the order.  See Minute Entry 3/9/2018 (dkt. 48).  The government subsequently filed a superseding indictment, see SI (dkt. 54), and the parties agreed to cancel the court-ordered evidentiary hearing, stipulating that the government "[would] not rely on or cite to the tolling order in order to establish the timeliness of any charges brought in this case or in

any future case against Mr. Bogucki," Stipulation (dkt. 55) at ¶ 1. Instead, the government stated that it was relying solely on the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 18 U.S.C. § 3293(2), which provides for a 10-year statute of limitations for the federal mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, "if the [charged] offense affects a financial institution." The government further agreed that it would not fall back on its reliance on § 3292(a)(1) should its attempt to use § 3293(2) fail. Stipulation at ¶ 1.

Bogucki filed a motion to dismiss the Superseding Indictment on April 27, arguing that the government's reliance on § 3293(2) is improper. Second Mot. to Dismiss (dkt. 58). That motion is now before the Court.

## II.     LEGAL STANDARD

In reviewing a motion to dismiss pursuant to Federal Rule of Criminal Procedure 12(b), a court must consider the indictment's allegations as a whole and assume them to be true. United States v. Buckley, 689 F.2d 893, 897, 899 (9th Cir. 1982). The indictment is to be "read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." United States v. Berger, 473 F.3d 1080, 1103 (9th Cir. 2007). At the same time, the court must not stray beyond the "four corners" of the charging document. United States v. Boren, 278 F.3d 911, 914 (9th Cir. 2002).

The government insists that whether the fraud alleged here affected a financial institution is a matter of fact that must be left to the jury. To the contrary, however, this Court may resolve issues of law and mixed issues of law and fact bound up in the interpretation of § 3293(2): "A pretrial motion is generally capable of determination before trial if it involves questions of law rather than fact." United States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir. 1986). But the government is correct that some of the determinations at issue here must be reserved for the trier of fact, as noted below.

United States District Court
Northern District of California

### III.    DISCUSSION

The defense presses two arguments as to why the government cannot rely on the 10-year statute of limitations contained in § 3293(2): (1) the government waived its ability to rely on that provision by not raising it in response to the first motion to dismiss; and (2) the government has not alleged a loss to either Barclays or its trading partners sufficient for § 3293(2) to apply.

### A.    Waiver theory

The defense first argues that the government waived its reliance on § 3293(2) by not raising it in opposition to the first motion to dismiss.  Waiver is the "intentional relinquishment or abandonment of a known right."  United States v. Scott, 705 F.3d 410, 415 (9th Cir. 2012) (quoting United States v. Olano, 507 U.S. 725, 733 (1993)).  In opposition to the first motion to dismiss, the defense contends, the government "conced[ed] . . . that the five-year statute of limitations in 18 U.S.C. § 3282(a) applied to the wire fraud charge against Mr. Bogucki."  Reply (dkt. 71) at 11.  That is, the government knew of grounds supporting the application of § 3293(2), and could have raised that longer limitations period in its opposition.  Id.

The defense cites no case in which a court has held that a defendant waives an argument in support of the validity of an indictment or complaint by failing to make that argument in response to a motion to dismiss a superseded version of the indictment or complaint.  As the government points out, this would be a strange rule: if prosecutors may supersede in order to add facts, charges, and/or legal theories, see Fed. R. Crim. P. 7(e), how can they be held to have waived reliance on facts, charges, and/or legal theories by not raising them earlier?

The government represents that it superseded the indictment in order to allege facts that would support the application of FIRREA's 10-year statute of limitations.  The defense's answer is that the government was not required to allege those facts in the indictment, and so could have proceeded on the original indictment without superseding.

Reply at 11.  Contrary to the defense's protestations in its reply, see id., this is equivalent to arguing that the government should not have been allowed to supersede; otherwise, the rule allowing the government to modify indictments would be a dead letter.  But whether the government is allowed to supersede under the law does not depend on whether or not it requires the new facts or legal theories in order to make its case.  Indeed, the defense cites no cases in support of the proposition that the government needs to make any showing regarding the substance of its indictment before being allowed to supersede.  The criminal rules state only that "the court may permit an information to be amended at any time before the verdict or finding" unless a different offense is charged or amendment would prejudice a "substantial right" of the defendant.  Fed. R. Crim. P. 7(e).  The defense does not argue that either of these two exceptions apply.

In sum, the defense does not contend that the government could not supersede its indictment, and does not cite any cases establishing that a Court is required to assess the extent to which the prosecution's facts and legal theories have changed from indictment to indictment before allowing the government to make a given argument in response to a motion to dismiss.  So the legal theory on which the defense premises its waiver argument is unclear.  The Court must reject it.

### B.   Application of § 3293(2)

The defense next argues that the government has not alleged an effect on either Barclays or its trading partners sufficient for § 3293(2) to apply.  The defense is correct that the alleged fraud did not, as a matter of law, affect Barclays' trading partners within the meaning of § 3293(2).  However, the defense is incorrect that the fraud did not as a matter of law have an effect on Barclays itself.

The government contends that Barclays was affected in several ways.  First, the fraud exposed Barclays to risk in the FX options market: "[H]ad the defendant's scheme failed, or had HP learned of the conduct, Barclays' options book would have been so 'short' as to be subject to the whims of a market the defendant and his co-conspirators had

United States District Court
Northern District of California

willfully manipulated." Opp. at 9. Second, Barclays "was compelled to pay legal expenses, including the indemnification of employees charged or involved in the scheme, in order to identify, investigate, and report the conduct." Id. Third, Barclays was "exposed to serious reputational risk, since the defendant's scheme alienated a large corporate client and undermined other clients' trust and confidence." Id. Fourth, Barclays "was required to disgorge profits and pay restitution related to the defendant's conduct" in exchange for the government's declination to prosecute. Id.

The defense counters that these are not cognizable effects within the meaning of § 3293(2). Specifically, it contends that (1) the statute does not encompass fraud perpetrated by a bank against itself, or by a bank employee against his employer; and (2) the statute does not encompass what we might think of as indirect or second-order effects such as litigation or settlement expenses, or increased risk from normal trading. The Court addresses these arguments in turn.

### 1.   Self-affecting theory

Courts sometimes refer to the contention that a bank or bank employee can itself/himself affect a financial institution within the meaning of § 3293(2) as a "self-affecting" theory. A number of courts have held that § 3293(2) plainly encompasses fraud perpetrated by a financial institution or its employees. See, e.g., United States v. Serpico, 320 F.3d 691, 695 (7th Cir. 2003) ("[W]e find it hard to understand how a bank that was put out of business as a direct result of the scheme was not 'affected,' even if it played an active part in the scheme."); United States v. Ohle, 678 F. Supp. 2d 215, 228–29 (S.D.N.Y. 2010); United States v. Countrywide Fin. Corp., 961 F. Supp. 2d 598, 605 (S.D.N.Y. 2013); United States v. Wells Fargo Bank, N.A., 972 F. Supp. 2d 593, 630 (S.D.N.Y. 2013); United States v. Bank of New York Mellon, 941 F. Supp. 2d 438, 454–56 (S.D.N.Y. 2013).

The defense urges the Court to reject this precedent on the ground that § 3293(2) "was enacted to protect banks from fraud, not to subject them to increased penalties based

on their own settlement agreements."[3] Second Mot. at 7. But the defense's interpretation conflicts with the plain language of the statute. Section 3293(2) provides that "No <u>person</u> shall be prosecuted, tried, or punished for a violation of, or a conspiracy to violate . . . section 1341 or 1343, if the offense affects a financial institution . . . unless the indictment is returned or the information is filed within 10 years after the commission of the offense." § 3293(2) (emphasis added). Bogucki would appear to be a "person" within the meaning of the statute. The statute does not contain any limiting language suggesting that it does not apply where a bank or bank employee is a defendant, and it is not for the Court to imply such a statement based on speculation about Congress's intent. <u>See</u> <u>Countrywide</u>, 961 F. Supp. 2d at 605; <u>Wells Fargo</u>, 972 F. Supp. 2d at 630; <u>New York Mellon</u>, 941 F. Supp. 2d at 454–56.

While the Court need not look beyond the statute's plain language, the legislative history supports this interpretation. As Judge Lewis Kaplan has ably explained, Congress was not merely concerned with shielding financial institutions from fraud committed by outside perpetrators when it passed the FIRREA. According to committee reports, Congress enacted the statute in the wake of the 1980s savings and loan crisis to "control the 'outright fraud and insider abuse' that had pervaded the thrift industry and that [Congress] found to have been a significant contributor to the crisis." <u>New York Mellon</u>, 941 F. Supp. at 454. Congresspeople "expressed concern both about fraud committed by outsiders against financial institutions and about fraud committed by insiders." <u>Id.</u> And Congress's concern encompassed acts bankers took in efforts to aid their employers, as well as acts taken to profit at their expense. <u>Id.</u> at 455. These fraudulent practices "cannot be understood to be directed at . . . the thrifts—after all, the thrifts themselves could have been charged with crimes in those very instances." <u>Id.</u> Congress was trying to protect depositors who lost money and federal taxpayers who were forced to bail out the banks as

---

[3] The Court need not consider the government's argument that it is not relying on a self-affecting theory in any event because Bogucki is not himself a bank to resolve this issue.

United States District Court
Northern District of California

a result of "thrifts' fraudulent behavior," and not—at least not primarily—financial institutions themselves. Id. at 455–56. Moreover, FIRREA sets forth the protection of depositors as one of its general purposes. Id. at 456. The defense's argument that the 10-year statute of limitations does not apply to frauds perpetrated by banks or bank employees therefore fails.

### 2.     Directness of harm

Next, the defense contends that any harm to Barclays was not sufficiently direct to trigger the 10-year limitations period in § 3293(2). The defense relies on cases which state that any effect on the financial institution must be a "direct consequence" of the charged conduct. See United States v. Ghavami, 23 F. Supp. 3d 148, 163–64 (S.D.N.Y. 2014), aff'd sub nom. United States v. Heinz, 607 F. App'x 53 (2d Cir. 2015). Aside from this precedent, the defense puts forth mainly policy reasons for adopting a narrow interpretation of § 3293(2). It argues that the government's interpretation would subject an incredibly broad range of conduct to the extended limitations period of § 3293(2), "eviscerat[ing] . . . bedrock principles" of fairness and leading to injustice and absurd results. Second Mot. at 9–11.

But the Court's analysis must begin with well-established principles of statutory construction, not policy considerations. See Collazos v. United States, 368 F.3d 190, 196 (2d Cir. 2004). Specifically, it must begin with the statutory text. The government appears to assume that it is clear on the face of § 3293(2) that the 10-year limitations period applies when a defendant's conduct exposes a financial institution to any risk of loss, no matter how remote that risk may be. It insists that whether the bank was actually exposed to a risk of loss is therefore a purely factual question that is for the trier of fact to decide.

But while the plain meaning of the statute indeed indicates that § 3293(2) is not limited to frauds perpetrated by people not employed by banks, the types of effects that may satisfy the provision are not clear from the statutory text. The provision cannot be interpreted to mean any effect, because the universe is an interdependent system and

everything can be said to affect everything else in one sense or another.  See Edward N. Lorenz, MIT, Prepared Remarks, Does the Flap of a Butterfly's Wings in Brazil Set Off a Tornado in Texas? (Dec. 29, 1972).  Buying chewing gum at a convenience store may affect a financial institution in some extremely remote way, but that would not suffice to get the question to a jury.

Because the directness of the harm required to trigger § 3293(2) is not clear on the provision's face, the Court must look to the statutory context.  Statutes must be read "in their context and with a view to their place in the overall statutory scheme." King v. Burwell, —U.S.—, 135 S. Ct. 2480, 2489 (2015) (quoting Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000)).  "The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." Brown & Williamson, 529 U.S. at 132.  "Legislation never is written on a clean slate, never is read in isolation, and never applies in a vacuum."  2B Norman J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 53:1 at 373–74 (7th ed. 2012).  Rather, legislation is part of a total system that "produces congruence even among statutes on different and dissimilar subjects through conventional modes of thinking about legislative problems and solutions, common idioms and customary language, and established approaches to statutory design." Id. at 374–75; see also Anderson v. Fed. Deposit Ins. Corp., 918 F.2d 1139, 1143 (4th Cir. 1990) ("[A] court should, if possible, construe statutes harmoniously.").

Section 3293 is a short statute, and none of its other provisions appear to bear on the question at hand.  The Court must, therefore, evaluate § 3293(2) in the context of the larger body of federal statutory law.  The term "affect" is, of course, widely used in the federal statutory scheme.  This may be relevant: the difference between statutes that are closely related and those that are not is merely one of degree.  2B Singer & Singer, Statutes and Statutory Construction, supra, § 53:2 at 385.  The interpretive relevance of statutes that are unrelated to the provision at hand "is simply that certain modes of legislative action are sufficiently conventional or standardized to influence the thinking of legislators and others

12

United States District Court
Northern District of California

1    contemplating the meaning of a particular statute in the system." Id.  Other statutes are

2    therefore particularly useful where the term is one that is invoked frequently in the

3    statutory scheme.  Id. § 53:3 at 391.

4         Perhaps the closest analogue here is to criminal statutes that give federal courts

5    jurisdiction where an offense "affects commerce."  For instance, 18 U.S.C. § 844(i)

6    prohibits damaging by means of fire or explosive "any building . . . used . . . in any activity

7    affecting interstate or foreign commerce."  § 844(i).  Courts have interpreted this provision

8    broadly.  For instance, the Supreme Court has held that the rental of real estate

9    "unquestionably" qualifies as an activity affecting interstate commerce, because "the local

10   rental of an apartment unit is merely an element of a much broader commercial market in

11   rental properties."  Russell v. United States, 471 U.S. 858, 862 (1985).  The Russell Court

12   construed the phrase "affects commerce" as being coextensive with the reach of the

13   Commerce Clause.  Id. at 859.  This is a common approach to construing statutory

14   provisions that require an effect on interstate commerce.  See, e.g., Waucaush v. United

15   States, 380 F.3d 251, 255 (6th Cir. 2004).

16        The Administrative Procedure Act provides another example.  That act bestows a

17   right to review on "[a] person suffering legal wrong because of agency action, or adversely

18   affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C.

19   § 702.  Courts have construed this phrase quite broadly, holding that a person may be

20   adversely affected within the meaning of a statute if he suffers harm to aesthetic,

21   economic, or spiritual values.  See Ass'n of Data Processing Serv. Organizations, Inc. v.

22   Camp, 397 U.S. 150, 153 (1970).  Indeed, courts often conflate adverse effects under § 702

23   with the constitutional requirement of injury in fact, itself a fairly capacious term.  United

24   States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669,

25   686 (1973).

26        These and other precedents counsel in favor of a broad reading of "affect" here.

27   This reading is bolstered by what Congress did not say.  For instance, Congress frequently

28   uses the term "substantially affect" when it wishes to impose a higher bar.  See, e.g., 28

13

U.S.C. § 455(b)(4) (judge shall disqualify himself when he has "interest that could be substantially affected by the outcome of the proceeding"); 16 U.S.C. § 1855(b)(3)(B) (requiring comment where action could "substantially affect" habitat); 18 U.S.C. § 1623 (barring prosecution where perjurer admits to perjury where "the declaration has not substantially affected the proceeding"). That it did not do so here is, accordingly, significant. Also significant is that Congress chose the term "affect" instead of the term "cause." The Tenth Circuit in construing § 3293(2) has noted that the former is "considerably broader" than the latter. United States v. Mullins, 613 F.3d 1273, 1278 (10th Cir. 2010). The defense is therefore incorrect that the statute adopts something like the "proximate cause" standard of tort law, and the Court disagrees with the defense's assertion that this is the standard the Second Circuit has adopted. See Mot. at 6 (citing United States v. Bouyea, 152 F.3d 192, 195 (2d Cir. 1998)).

The defense noted at oral argument that Congress could also have added the words "indirectly or directly" following "affect." This is indeed a somewhat common formulation in the statutory scheme, and the defense is correct that its omission counsels in favor of a narrower reading. However, even "direct" effects may still be quite capacious, as the above examples indicate.

The legislative history cited above also supports the reading that § 3293(2) encompasses a broad range of possible effects. If Congress was concerned with both fraudulent conduct in which banks were the victim and conduct in which banks (or their employees) defrauded others while taking on additional risk, then it would not make sense to limit § 3293(2) to cases in which banks themselves were defrauded. In other words, the statute cannot only apply to cases in which the banks would have standing to bring a civil suit, which is the position the defense seems to take.

Having determined that § 3293(2) encompasses a broad range of possible effects, the Court now turns to the particular effects on Barclays identified by the government.

### a.    Litigation risk to Barclays

The government contends that Bogucki's alleged conduct exposed Barclays to an

United States District Court
Northern District of California

14

United States District Court
Northern District of California

increased risk of loss through litigation or regulatory proceedings.  Though the defense

argues that the Court would break new ground by holding that the 10-year statute of

limitations applies her4, other courts have found that this is the exact type of risk

encompassed by § 3293(2).  In a Second Circuit case with facts quite similar to this one,

United States v. Heinz, 790 F.3d 365, 366–67 (2d Cir. 2015), the court found that the

government had properly alleged an effect on a financial institution within the meaning of

§ 3293(2) where three employees of a financial services company had rigged bids in the

municipal bond market on behalf of their employers.  Id. at 366.  The government alleged

an effect on a financial institution on the basis of both settlement agreements the banks had

entered into with various government authorities as a result of the offense conduct, and

attorney's fees the banks had paid "arising from the investigations that resulted in the Bank

Agreements."  Id. at 367.  The court held that this was sufficient: "It is undisputed that the

banks executed the Bank Agreements prompted in part by the fraudulent conduct of the

Defendants and their co-conspirators."  Id.

      Similarly, in United States v. Ohle, the district court held that the government

properly relied on § 3293(2) where the defendant's employer "paid over $24,000,000 in

settlements . . . and over $4,200,000 in attorneys' fees defending the suits."  678 F. Supp.

2d at 229.  These losses were "a direct and foreseeable result of the [defendant's]

conspiracy."  Id.  In Countrywide, meanwhile, the government satisfied § 3293(2) by

alleging that a bank defendant "ha[d] paid billions of dollars to settle repurchase claims by

Fannie Mae and Freddie Mac made a result of the fraud here alleged."  961 F. Supp. 2d at

605.

      Litigation risk, therefore, fits comfortably within the scope of the effects that trigger

§ 3293(2).  Even so, the defense argues, there is no evidence that Barclays actually faced

such a risk.  First, while the government notes that Barclays signed a declination letter

agreeing to pay over $12 million as a result of Bogucki's conduct, the defense argues that

the government has not established that the letter came as a result of the fraudulent

activities alleged here.  This argument is curious, given the letter's statement that Barclays

United States District Court
Northern District of California

1   misappropriated HP's confidential information, "as described in the indictment returned in

2   United States v. Bogucki, 18-CR-00021 (N.D. Cal.)."  Declination Letter at 1.  In any

3   event, the Declination Letter is merely evidence that the trier of fact may consider in

4   determining whether Bogucki's alleged conduct risked a loss to the bank.  In other words,

5   the relevance of the declination letter is a question of fact, not one of law.  The defense

6   cites United States v. Rubin/Chambers, Dunhill Ins. Servs., 831 F. Supp. 2d 779, 784

7   (S.D.N.Y. 2011), in support of its position, but unlike in Dunhill, the settlement agreement

8   that Barclays entered into did not "disclaim[] any factual admissions."  Id.  That "many

9   considerations . . . may have caused Barclays to enter into" its agreement with the

10   government, Second Mot. at 9, does not suffice to establish as a matter of law that the

11   alleged conduct did not risk a loss to Barclays.

12         The defense also argues that Barclays' settlement also cannot be considered to have

13   had any effect on the bank because (1) it was only for $12 million, and (2) the settlement

14   amount consisted entirely of disgorgement, so merely returned Barclays to the position it

15   had been in prior to the alleged fraud.  See Opp. at 9.  However, it cites no case law for

16   these propositions.  There is no reason to think that a $12 million loss is insufficient to

17   constitute an effect under § 3293(2).  And Barclays' gains from the allegedly unlawful

18   trading may exceed its litigation losses does not mean that it was not affected by the trades

19   within the meaning of § 3293(2).  The defense's interpretation flies in the face of the

20   analytical separation between harm and damages in other areas of the law.  The statute,

21   again, speaks only to an "effect," and not, for instance, a "net effect."  More importantly,

22   the government need not show that the bank actually lost money, but rather only that the

23   bank was exposed to a risk of loss.  United States v. Stargell, 738 F.3d 1018, 1022 (9th Cir.

24   2013); Serpico, 320 F.3d at 694.  A jury could find that Bogucki's alleged fraud exposed

25   the bank to a risk of loss through litigation, whether or not it actually suffered one.

26         The defense's argument that this holding will allow the government to

27   "manufacture" an effect on a financial institution "simply by choosing to investigate a

28   financial institution" fails for much the same reason.  Opp. at 9.  FIRREA is only triggered

United States District Court
Northern District of California

when the defendant's conduct exposes the bank to a new risk of loss—not whenever the government investigates a bank.  The question must be viewed in light of the circumstances pertaining at the time of the relevant conduct—not in light of whether litigation or government investigations actually ensued.  Of course, actual litigation or investigations may be evidence that the defendant's conduct exposed the bank to a risk of a loss.  But if the government launches an investigation into a bank solely because it wishes to trigger FIRREA—not because it is actually concerned about a defendant's conduct— then this would not constitute such evidence.  We are by now well afield of the motion-to-dismiss posture, but the point is that courts have plenty of tools to address the defense's concern.

The defense next argues that considering the risk of litigation costs incurred as a result of the allegedly fraudulent conduct as an effect under § 3293(2) "would expose every bank employee charged with a predicate FIRREA offense to an extended ten-year limitations period . . . no matter how pedestrian the crime."  Opp. at 10.  In cases where the defendant's conduct exposes the bank itself to liability, this is quite right.  The Court fails to understand, however, how this result conflicts with the statutory language.  It is not for the Court to decide whether or not the policy behind § 3293(2) is a wise one.

### b.     Reputational risk to Barclays

The defense also argues that risks of loss caused by harm to a bank's reputation are, as a matter of law, outside the scope of § 3293(2).  The Court disagrees.  That bank employees are defrauding a bank's counterparties could have serious reputational effects on that bank.  Other counterparties or customers might be wary of trusting the bank in situations that require trust, and might even decline to deal with the bank.  Any loss suffered as a result would be fairly direct.  This is not a case in which the government alleges a risk of reputational harm to the bank merely on the ground that it employs someone who has committed a fraud.  On the contrary, the reputational risk claimed here goes to the heart of the bank's business.  This is one of the risks encompassed by the statute.

### c.     Trading risk to Barclays

Finally, the government contends that Bogucki's alleged fraud exposed Barclays to an increased risk of loss in trading.  The argument is that, in selling options to drive down the price in advance of the HP unwind, Bogucki exposed Barclays to the risk that the price of British pounds would increase, causing Barclays' trading partners to cash in their options and resulting in a loss to Barclays.  The defense counters that the government fails to allege that Bogucki's trading was itself illegal, so the alleged illegal conduct could not have caused a risk of a loss.

This argument fails because the wire fraud statute punishes not mere misrepresentations, but "scheme[s] or artifice[s] to defraud."  See 18 U.S.C. § 1343.  The defense is correct that, had Bogucki traded without misrepresenting his actions to HP, there could be no claim that he committed wire fraud.  By the same token, however, had Bogucki made misrepresentations to HP that were unconnected to a scheme to "obtain[] money or property," there could be no allegation of wire fraud.  See id.  It is both the misrepresentation and the attempt to profit from that misrepresentation by trading that make up the scheme to defraud alleged in the superseding indictment.  See United States v. Mastelotto, 717 F.2d 1238, 1245 (9th Cir. 1983) (Multiple misrepresentations and transactions may make up part of one unitary scheme; "the scope of a scheme to defraud is ultimately restricted . . . only by the ingenuity of its participants.").

The defense also argues that Bogucki's alleged fraud did not increase the risk of a trading loss because such risk is "inherent in the bank's business model."  Opp. at 11.  Investment banks, the argument goes, take risks every time they trade, so conduct that exposes a bank to trading losses is not the type of conduct that may constitute a "new or increased risk of loss."  Stargell, 738 F.3d at 1022.  This interpretation, however, cuts against the broad statutory language.  If Congress had wanted to specify that the effect the alleged fraud had on a financial institution must be out of the ordinary, it could have done so.  It did not.  While there is no need to look beyond the statutory text, it may well have been Congress's judgment that trades made as part of a scheme to defraud are inherently

riskier for the trader than other trades would be.  The committee reports back up this interpretation.  <u>See</u> 941 F. Supp. at 454.  So the defense's argument is shaky even on its own terms: Bogucki's trading <u>was</u> unusual in that it exposed Barclays to a risk of loss stemming from an alleged scheme to defraud.  Given the clear statutory language, it is not the Court's role to determine whether such trading is inherently more or less risky than other types of trading.

### d.      Trading risk to counterparties

Finally, the government argues that the alleged fraud had an effect on two of the firms to whom Barclays sold FX options prior to the unwind, referred to in the superseding indictment as Financial Institution A and Financial Institution B.  The Court need not address this issue to deny the motion to dismiss.  Nevertheless, it will do so in the interest of clarifying the scope of the issues at trial.

The government states that these counterparties did not know of HP's impending options trades at the time they made their deals with Barclays, and analogizes the effect of the alleged fraud on these financial institutions to the effect of insider trading.  "[T]he market was manipulated in a way that artificially depressed the price of volatility, affecting FDIC-insured institutions that traded with Barclays during the scheme."  Opp. at 12.

It is worth spinning out the analogy.  Securities and Exchange Commission Rule 10b-5, enacted pursuant to § 10(b) of the Securities Exchange Act of 1934, bars "manipulation and deception in connection with the purchase or sale of any security."  One may be liable under § 10(b) for making either a deceptive misstatement or an omission.  <u>Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164, 177, (1994).  An omission is only actionable, however, where there is a duty to disclose.  <u>Chiarella v. United States</u>, 445 U.S. 222, 227 (1980).

Insider trading is a form of omission liability.  The paradigmatic insider-trading situation involves a defendant buying low (or selling high) on confidential non-public information, then reaping the gains when that information becomes public and the market responds.  The act of trading is not deceptive "in itself," but is only so when the trader

breaches a duty.  The "classical" theory of insider trading liability posits that a corporate insider violates Rule 10b-5 and § 10(b) by trading on the basis of material, nonpublic information, violating a duty to shareholders—that is, the parties with whom the insider is trading.  United States v. O'Hagan, 521 U.S. 642, 651 (1997).  A second theory makes a trader liable when he "misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information."  Id. at 652.  While the classical theory recognizes harm to the parties with whom the insider trades, the misappropriation theory recognizes that trading on confidential information may breach "a duty owed not to a trading party, but to the source of the information."  Id. at 652–53.

The offense charged here could not have been charged as insider trading for the simple reason that no securities changed hands.  That does not necessarily make the analogy is inapt.  What does make it inapt is that the government does not claim that Bogucki had a duty to disclose to its counterparties that HP was preparing to sell its options.  The only duty the indictment alleges is to HP.  Meanwhile, the government does not allege that Bogucki made any affirmative misrepresentations to Barclays' counterparties.  Those counterparties, therefore, were not deceived by Bogucki.

The government attempts to address this shortcoming by arguing that "there are several classes of victims" when an insider trades on material non-public information: "the company from which he stole the information, the counterparties he traded with based on the information, and other entities trading in the market who do so based on unfairly manipulated prices and demand."  Opp. at 12.  This sounds like a restatement of the "fraud-on-the-market" doctrine, which holds that, because "the price of a company's stock is determined by the available material information regarding the company and its business," misleading statements "defraud purchasers of stock even if the purchasers do not directly rely on the misstatements."  See Basic Inc. v. Levinson, 485 U.S. 224, 241 (1988).  Plaintiffs may use the fraud-on-the-market theory to establish reliance under Rule 10b-5.  Id.

The problem with the fraud-on-the-market analogy, however, is that the government

has not actually identified any fraud on the market.  In insider trading, the fraud is not "on the market," but rather on the party to whom the defendant breached a duty.   This is because, "[i]n contrast to a fraud-on-the-market scheme, insider trading does not artificially boost or deflate the market price of a stock aside from typically negligible supply and demand adjustments."  In re Aldus Sec. Litig., No. C92-885C, 1993 WL 121478, at *7 (W.D. Wash. Mar. 1, 1993).  Based on the allegations in the superseding indictment, Barclays' counterparties would not have standing to sue either Bogucki or the bank.  So it is hard to see how they could have been "affect[ed]" by the fraud within the meaning of § 3293(2).  Any risk of loss they incurred resulted entirely from their own trading decisions.  Accordingly, even under the relatively broad reading of § 3293(2) the Court adopts here, the government's argument that the alleged fraud increased the trading risk to Barclays' counterparties fails.

## IV.   CONCLUSION

For the foregoing reasons, the motion to dismiss is **DENIED**.


**IT IS SO ORDERED.**

Dated: July 2, 2018

_____
CHARLES R. BREYER
United States District Judge