Sean Hecker (*pro hac vice*)
Derek Wikstrom (*pro hac vice*)
Alexandra Conlon (*pro hac vice*)
Abra Metz-Dworkin (*pro hac vice*)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue
Suite 7110
New York, NY 10118
Tel: (212) 763-0883
shecker@kaplanhecker.com
dwikstrom@kaplanhecker.com
aconlon@kaplanhecker.com
ametz-dworkin@kaplanhecker.com

Josh A. Cohen (SBN 217853)
Adam F. Shearer (SBN 279073)
CLARENCE DYER & COHEN LLP
899 Ellis Street
San Francisco, CA 94109
Tel: (415) 749-1800
Fax: (415) 749-1694
jcohen@clarencedyer.com
ashearer@clarencedyer.com

Attorneys for Defendant
ROBERT BOGUCKI

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR-18-0021 CRB |
| Plaintiff, | **ROBERT BOGUCKI'S LEGAL MEMORANDUM REGARDING USE OF CONFIDENTIAL INFORMATION FOR COMMERCIAL ADVANTAGE** |
| v. | |
| ROBERT BOGUCKI, | |
| Defendant. | |

At the end of the first full day of trial on February 21, 2019, the Court made the following observation and asked the following question:

> I think the government in this case is relying on the fact that – not that [Mr. Bogucki] went out to hurt HP, but rather that he traded for his own benefit. And when I say 'his,' I mean Barclays' benefit. That is, that he used the information. He used the information to gain an economic advantage.
>
> And then the question is: Okay, was that wrong?

RT 304.

Mr. Bogucki respectfully submits this memorandum in an effort to assist the Court in answering its question. For the reasons set forth herein, the answer to the question is no.

**RELEVANT BACKGROUND**

The Court has heard only one day of trial testimony, and the government has not yet rested. However, Mr. Bogucki does not expect the government to adduce any further testimony in support of its theory that Mr. Bogucki owed a so-called "duty of trust and confidence" to HP that was purportedly violated by Barclays' trades. That theory rests in its entirety on (1) the recorded conversations the government played on Thursday between Mr. Bogucki and HP Director of Foreign Exchange Zac Nesper, during which Mr. Bogucki referred to HP's "best interests" and said he would "step up as much as I can" in response to Mr. Nesper's request for a "trust-type exit," RT 270; (2) Mr. Nesper's subjective belief that Barclays was "working on [HP's] behalf,"

RT 305;[1] and (3) a confidentiality agreement that Barclays' M&A division executed when HP engaged them to advise HP about the Autonomy acquisition.[2] Dkt. 196-1.

Mr. Bogucki expects that the Court will also receive into evidence the credit agreement that applied to HP's FX hedging, which stated explicitly that Barclays could enter into transactions for Barclays' own account. The evidence will also include the master ISDA agreement, which governed the unwind transactions at issue (and all other FX options transactions between Barclays and HP) and made clear that the parties were buying and selling options as principals, at arm's length, and "not as agent or in any other capacity, fiduciary or otherwise."

Finally, the evidence has already shown that the supposedly "confidential" information Barclays received from HP in connection with the unwind was not confidential at all. That information was "that HP intended to sell a large quantity of cable options in September and October 2011." Dkt. 54 (Superseding Indictment), ¶ 16.a. But by the time of the unwind, it was public knowledge that (1) HP was going to close its acquisition of Autonomy by a date certain in early October; (2) the purchase price for Autonomy was approximately $11 billion; (3) HP had purchased FX options in connection with the Autonomy acquisition; (4) HP had paid a premium of $333 million for the options; and (5) HP was virtually certain to unwind the options on or before the date the Autonomy deal closed because, *inter alia*, the exchange rate had moved in HP's favor, such that it was cheaper for HP to buy pounds on the spot market than to exercise its options. Although the exact timing of the unwind was not public, it stood to reason that HP would unwind at or near the point at which the acquisition became a certainty (since at that point HP no

---

[1] Mr. Nesper's testimony to this effect was admitted over Mr. Bogucki's objection and subject to a motion to strike. Mr. Bogucki objects to the testimony because Mr. Nesper's subjective belief about the duty he was supposedly owed is irrelevant where, as here, Barclays did not owe HP a duty as a matter of law. *See United States v. Litvak*, 889 F.3d 56, 68-69 (2d Cir. 2018) (reversing conviction due to admission of counterparty's irrelevant testimony that he believed defendant was acting as his agent).

[2] Mr. Bogucki has moved to exclude the confidentiality agreement from evidence because it did not apply to the FX transactions at issue in this case. Dkt. 196. Notably, the government's witness list does not include anyone competent to testify to the agreement's meaning or significance.

longer needed the option, and the option's residual value declined each day thereafter).  In any event, no one except HP knew exactly when HP would unwind.  RT 235.

## LEGAL ANALYSIS

The government has asked the Court to instruct the jury that Mr. Bogucki owed a duty of "trust and confidence" to HP, and that he can be convicted of wire fraud on the theory that he violated that duty by causing Barclays to sell options ahead of the unwind.  Specifically, the government's proposed jury instruction reads, in part, as follows:

> A defendant may be found guilty of wire fraud where he knowingly and with fraudulent intent misappropriates confidential information in violation of a duty of trust and confidence owed to the source of that information, and then uses that information for his own benefit.  In using this information for his own purposes and without disclosing his intentions to the source of the information, a defendant deprives the victim of the exclusive use of its confidential information.

Dkt. 162 (Govt's Proposed Jury Instructions), at 42.[3]

As the Court suggested on Thursday, this theory *sounds* viable.  The reason it sounds viable, however, is not because it is an acceptable theory of prosecution in general wire-fraud cases like this one.  Rather, it sounds viable because it is familiar from insider-trading and other *securities-fraud* prosecutions.  Under the misappropriation theory of securities-fraud liability, "a person violates Rule 10b-5 when he misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction."  *United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991).  Indeed, Rule 10b5-2 bears the title "Duties of trust or confidence in misappropriation insider trading cases."  It expressly provides that such a duty exists "[w]henever a person agrees to maintain information in confidence" and "[w]henever the person communicating the material nonpublic information and to person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know

---

[3] The government's proposed instruction goes on to describe what the government believes it must prove to establish this theory.  It cannot be overemphasized that this description is derived from whole cloth; the government essentially made it up.

that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality." 17 C.F.R. § 240.10b5-2(b)(1) & (2).

But this is not a securities-fraud prosecution. Mr. Bogucki is not charged with violating Rule 10b-5 (nor could he be, as neither he nor anyone close to him engaged in a securities transaction relating to Autonomy, HP, or any related entity). For several reasons, the misappropriation theory the government has borrowed from the realm of insider trading does not apply in the context of general commercial relations.

First, there is no analog to Rule 10b-5 in the Uniform Commercial Code, or anywhere else in the law governing principal-to-principal commercial affairs. Accordingly, to give the government's proposed instruction and allow Mr. Bogucki to be convicted on the theory that he violated a duty of trust, the Court would have to extend Rule 10b-5 liability to arm's-length transactions that do not involve trading in securities.

Second, the government cannot cite to any case in support of the proposition that such an extension is appropriate. We know of no reported case holding that a merchant who uses customer information conveyed to him in confidence for the merchant's own commercial advantage is committing a federal crime. At most, the government can point to securities-fraud cases that derive a duty of trust and confidence from Rule 10b-5, *see* Dkt. 127 (Govt's Memo of Law Regarding Duty) at 3-4 (collecting securities-fraud cases), and to a case in which an employee violated a fiduciary duty to his employer, *see id.* at 3 (citing *Carpenter v. United States*, 484 U.S. 19 (1987)). But those cases do not speak to the issue in this case, which is whether a general duty of trust and confidence exists in settings where Rule 10b-5 does *not* apply, and where there is no other source of a fiduciary relationship to the counterparty.

Third, the implications of extending Rule 10b-5 to arm's-length commercial relationships would be staggering. By way of illustration, companies routinely approach multiple vendors to bid on future projects – and thereby convey non-public information about their commercial intentions. It cannot be that, as a matter of criminal law, each vendor is forbidden to use that information for the vendor's own business advantage. Thus, when United Airlines tells Boeing it is in the market for 100 new jets, Boeing is perfectly free to lock in preferential supply contracts

with engine manufacturers in anticipation of receiving United's order – even if Boeing does not pass the savings on to United when the order ultimately comes in.  Although the "product" in Mr. Bogucki's case is a foreign-exchange option rather than a jumbo jet, the principle is the same: absent an express contract, nothing prohibits a company from using confidential information for the company's own advantage, even if the provider of the information does not reap a commensurate gain.  Holding otherwise would transform commerce as we know it and give rise to virtually unlimited criminal liability for routine business affairs.

Fourth, and relatedly, criminalizing Barclays' use of the information it received from HP about HP's plans to unwind raises serious due-process concerns.  Neither Mr. Bogucki nor any other trader in his position in 2011 was on notice that conduct that ran afoul of no rule or regulation could result in an experimental or novel prosecution by the Department of Justice.  Again, this case is not about insider trading; it does not even involve *securities* trading.  No one similarly situated to Mr. Bogucki could have foreseen that prosecutors would seek to extend Rule 10b-5 liability into a context where Rule 10b-5 simply does not apply.

Fifth, the transactions at issue in this case were governed by contracts that expressly permitted Barclays to make the trades Barclays made.  The ISDA Master Agreement executed by Barclays and HP provided that each party was entering into each options transaction "as principal (and not as agent or in any other capacity, fiduciary or otherwise)," and that "[n]either party holds itself out as advising, or any of its employees or agents as having any authority to advise, the other party as to whether or not it should enter into . . . any Transaction."  Dkt. 86-4, § 5(l).  And the credit agreement referenced in Mr. Bogucki's opening statement contained a section entitled "NO FIDUCIARY DUTY" that stated that Barclays "may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of [HP.]"  Dkt. 86-1, § 9.14.  Accordingly, even if there were a default rule against using confidential information for one's own benefit in the general commercial context – which, again, there is not – the parties contracted around that rule here.

In short, the answer to the Court's question – was it wrong for Barclays to use the information that HP was going to unwind for Barclays' advantage? – is no.  There is no such thing

as a freestanding "duty of trust and confidence" in the general commercial realm; a merchant does not acquire a legal duty not to use information for the merchant's own advantage just by receiving that information from a prospective counterparty.  Imposing such a duty in this case would have sweeping, unforeseen consequences for day-to-day commerce, and would present a severe problem of constitutional notice.  And the terms of engagement negotiated by Barclays and HP defeat the existence of such a duty in this case even if the duty could arise as a matter of law.

It is tempting to bite the apple the government is feeding the Court.  But it is a 10b-5 apple, and it is poisonous here.  The Court should reject it.

Dated:  February 24, 2019                           Respectfully submitted,

KAPLAN HECKER & FINK LLP

By  /s/
    Sean Hecker
    Derek Wikstrom
    Alexandra Conlon
    Abra Metz-Dworkin


CLARENCE DYER & COHEN LLP

By  /s/
    Josh A. Cohen
    Adam F. Shearer

    Attorneys for Defendant Robert Bogucki