DAVID L. ANDERSON (CABN 149064)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

JUSTIN D. WEITZ (New Jersey Bar # 03766-2011)
BRIAN R. YOUNG (Ohio Bar # 0078395

CHINHAYI COLEMAN CADET (CABN 194542)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Fax: (415) 436-7234
    Chinhayi.Cadet@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CASE NO. CR 18-00021 CRB** |
| Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL |
| v. | |
| ROBERT BOGUCKI, | |
| Defendant. | |

**TABLE OF CONTENTS**

LEGAL STANDARD...................................................................................................................5

ARGUMENT ..............................................................................................................................6

I.      There is Sufficient Evidence for a Rational Jury to Convict ..........................................6

      A.     The scheme was intended to manipulate volatility and "obtain money or property" ........................................................................................................6

      B.     The scheme to depress volatility is criminal because the defendant used material misrepresentations and half-truths to further it.................................9

            1.     The Defendant's Misrepresentations ....................................................10

            2.     Evidence of the Defendant's Intent.......................................................16

      C.     Misappropriation of Confidential Information ...............................................17

II.     The Defendant's Other Arguments Are Not Rule 29 Issues........................................21

CONCLUSION ........................................................................................................................22

# TABLE OF AUTHORITIES

## CASES

*Carpenter v. United States*, 484 U.S. 19, 25 (1987) ................................................................ 18

*Diaz-Rosendo v. United States*, 357 F.2d 124, 130 (9th Cir. 1966) .......................................... 6

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) .................................................................... 5

*Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967) ................................................... 15

*United States v. Alarcon–Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002) ...................................... 20

*United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979) ................................... 6, 14, 15, 16

*United States v. Benson,* 48 F.2d 42, 47 (2d Cir. 1997) ............................................................ 19

*United States v. Bernhardt*, 840 F.2d 1441, 1448 (9th Cir. 1988) .............................................. 5

*United States v. Brugnara*, 856 F.3d 1198, 1208 (9th Cir. 2017) ............................................. 20

*United States v. Brugnara*, No. 14-0306 WHA (N.D. Cal. Oct. 9, 2015) .................................. 20

*United States v. Camacho*, 528 F.2d 464, 469 (9th Cir. 1976) ................................................... 6

*United States v. Ciccone*, 219 F.3d 1078, 1083 (9th Cir. 2000) ............................................... 19

*United States v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010) .................................................. 22

*United States v. Halbert*, 640 F.2d 1000, 1009 (9th Cir. 1981) ............................................... 19

*United States v. Hedaithy,* 392 F.3d 580, 595-96 (4th Cir. 2004) ............................................ 18

*United States v. Johnson*, 16-cr-457, 2017 WL 5125770 ......................................................... 18

*United States v. Johnson*, 297 F.3d 845, 868 (9th Cir. 2002) ..................................................... 5

*United States v. Jones*, 425 F.2d 1048, 1051 (9th Cir. 1970) ..................................................... 6

*United States v. Jones*, 472 F.3d 1136, 1139 (9th Cir. 2007) ................................................... 21

*United States v. LeVeque*, 283 F.3d 1098, 1103–04 (9th Cir. 2002) ........................................ 15

*United States v. Lothian*, 976 F.2d 1257, 1267-68 (9th Cir. 1992) ...................................... 16, 17

*United States v. Maze*, 414 U.S. 395, 407 (1974) .................................................................... 21

*United States v. Milovanovic*, 678 F.3d 713, 728 (9th Cir. 2012 .............................................. 18

*United States v. Montgomery*, 384 F.3d 1050, 1063–64 (9th Cir. 2004) .................................. 15

*United States v. Pelisamen*, 641 F.3d 399, 409 (9th Cir. 2011) .................................................. 6

*United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003) ............................................ 7, 16

*United States v. Sandoval*, 234 F.3d 1279 (9th Cir. 2000) ............................................ 5

*United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) ............................... 7, 16

*United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2010) ................................ 15

*United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003) ..................................... 6

**OTHER AUTHORITIES**

Black's Law Dict. 10th ed. (2014) .................................................................................. 8

Ninth Circuit Model Criminal Instruction ..................................................................... 15

**RULES**

Fed. R. Crim. P. 29(a) ..................................................................................................... 5

**REGULATIONS**

76 Fed. Reg. 41375 ......................................................................................................... 22

76 Fed. Reg. 41382 ......................................................................................................... 22

Government's Response to Defendant's Motion for a Judgment of Acquittal
18-CR-0021 CRB

1   **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR A JUDGMENT OF**

2   **ACQUITTAL**

3      Following the close of the government's case on February 28, the defendant moved for a judgment

4   of acquittal under Fed. R. Crim. P. 29(a).  The record contains more than enough evidence for a rational

5   juror to conclude, beyond a reasonable doubt, that the defendant committed the charged crimes.  The Court

6   may not be enamored of this prosecution.  But the record contains sufficient evidence to withstand a Rule

7   29 challenge at this stage and send the case to the jury.  This Court should do that.

8   **LEGAL STANDARD**

9      In evaluating a motion under Rule 29(a), the Court must view the evidence in the light most

10  favorable to the Government, and decide whether a rational trier of fact could find the defendant guilty.

11  *United States v. Johnson*, 297 F.3d 845, 868 (9th Cir. 2002).  This standard requires the Court to "grant[]

12  to the government all reasonable inferences that may be drawn from the evidence."  *Id*.  The Court "must

13  respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary

14  conflicts, and draw reasonable inferences from proven facts."  *United States v. Sandoval*, 234 F.3d 1279

15  (9th Cir. 2000) (citation omitted).  A sufficiency inquiry "does not require a court to ask itself whether *it*

16  believes that the evidence at trial established guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443

17  U.S. 307, 318-19 (1979) (emphasis in original) (citation omitted).  Rather, the Court is to review the

18  evidence and, if a rational trier of fact could convict, give the jury the opportunity to render its verdict.

19     Rule 29 is not the appropriate vehicle for the resolution of extraneous legal issues, such as the

20  defendant's suggestion that he had insufficient notice that his conduct was criminal.  Rule 29(a) clearly

21  sets forth the scope of the district court's authority: to enter a judgment of acquittal for "any offense for

22  which the evidence is insufficient to sustain a conviction."  There may be *legal* issues with the prosecution,

23  which are appropriately resolved in either pretrial or post-trial motions.  But they are not for Rule 29; per

24  its plain wording, Rule 29 requires a cold look at the evidence in the record.  Indeed, "the district court's

25  function in reviewing a defendant's motion for acquittal is quite narrow."  *United States v. Bernhardt*, 840

26  F.2d 1441, 1448 (9th Cir. 1988).

27     The defendant is charged with two offenses: wire fraud affecting a financial institution, and

28

Government's Response to Defendant's Motion for a Judgment of Acquittal
18-CR-0021 CRB

5

conspiracy.  The "elements of wire fraud are: (1) the existence of a scheme to defraud; (2) the use of [wires]; and (3) specific intent to defraud."  *United States v. Pelisamen*, 641 F.3d 399, 409 (9th Cir. 2011).[1] "[T]he government is not required to prove any particular false statement was made" so long as there is "proof of a scheme or artifice to defraud, which may or may not involve any specific false statements."  *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003).  To show a conspiracy, a formal agreement is not necessary.  *United States v. Camacho*, 528 F.2d 464, 469 (9th Cir. 1976).  "(E)ach participant in the conspiracy need not know what other participants are doing, or why."  *United States v. Jones*, 425 F.2d 1048, 1051 (9th Cir. 1970)  Once a conspiracy is proved, "slight evidence is all that is required to connect a defendant with the conspiracy."  *Diaz-Rosendo v. United States*, 357 F.2d 124, 130 (9th Cir. 1966).

To succeed on a misrepresentations and half-truths theory, "[t]he government need not prove each allegation of fraud.  Proof of any one or more of the fraudulent representations is sufficient."  *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979).

## ARGUMENT

### I.   There is Sufficient Evidence for a Rational Jury to Convict

The dispute in this case is straightforward: did the defendant, along with his subordinates at Barclays, act in a manner that *intentionally* depressed the Bloomberg volatility to the benefit of Barclays and the detriment of HP?  The legal gloss on this question is also straightforward: the government must prove that the defendant either misappropriated HP's confidential information, or that he used material misrepresentations and half-truths to further his scheme.  The record indicates that a rational juror could conclude that the defendant did both.

### A.   The scheme was intended to manipulate volatility and "obtain money or property."

Barclays agreed to buy options from HP for a price that referenced the Bloomberg volatility, so that HP would have transparency about the price of volatility at the time of the unwind.  Tr. at 134.  Lower volatility would mean that Barclays would pay less for the options and that HP would receive less.  *See*, *e.g.*, Tr. at 165.  The evidence also confirmed that market participants holding a "short" vega position –

---

[1] The parties have stipulated that sufficient evidence has been produced for the government to satisfy its burden as to the interstate wire and "affecting a financial institution" elements, *see* Exs. 180, 187, Tr. 834-36.

Government's Response to Defendant's Motion for a Judgment of Acquittal
18-CR-0021 CRB

1   as Barclays did at key points – would stand to benefit from lower volatility.  Tr. at 906.

2        At bottom, this case comes down to a single question: what was the defendant's intent?  "It is

3   settled law that intent to defraud may be established by circumstantial evidence."  *United States v. Rogers*,

4   321 F.3d 1226, 1230 (9th Cir. 2003).  In addition, "[i]ntent may be inferred from misrepresentations made

5   by the defendants, and the scheme itself may be probative circumstantial evidence of an intent to defraud."

6   *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (citation omitted).  There is ample probative

7   evidence in the record of the defendant's intent regarding the nature of Barclays' options shorting.

8        There is no dispute that, as the Court pointed out (Tr. at 1030), HP knew Barclays would have to

9   hedge following the first tranche of the unwind and clear its risk.  Indeed, the parties discussed this prior

10  to the transaction.  What is disputed is whether Barclays acted in a way purely to clear its risk, or in a way

11  that served to manipulate the market to benefit Barclays and hurt HP.

12       During argument on this motion, the Court cited Exhibit 195, which were the Barclays policies in

13  effect at the time of the transaction.  Tr. at 1018-19.[2]  There are two misconceptions in the way the

14  defendant has framed this document, and they are misconceptions that contradict the evidence.  First,

15  while the Court viewed this as applying to securities (Tr. at 1018:20-21), the head of compliance at

16  Barclays testified explicitly that the bank's anti-frontrunning policy applied to all market activities (Tr. at

17  793), including the trading of FX options (Tr. at 794), because the harms posed by frontrunning were

18  present in the FX market (Tr. at 795).  Second, the document expressly prohibits frontrunning, while

19  carving out a limited exception for *bona fide* hedging.  The defendant wants the exception to swallow the

20  rule.  But the rule is clear:  trading ahead on confidential information was improper "if a calculated intent

21  to profit from the impact of the customer transaction is the impetus for such trade."  (Ex. 195 at 7-8.)[3]

22

23  _____

[2] The government has maintained throughout this prosecution that Barclays' policies are not
24  relevant except inasmuch as they show the defendant's intent.  The Court expressed interest as to what
    policies addressed this, and the government obtained the relevant materials.  These policies clearly prohibit
25  frontrunning, as Barclays' head of compliance testified.  But whatever Barclays' polices say, the defendant
    is not accused of violating Barclays' policies, and the parties, the Court, and the jury must not substitute
26  Barclays' judgment for the applicable law here.

    [3] Rule 29 decisions must be made based on what is in the record.  But the defendant's supervisor,
27  Michael Bagguley, testified in a Rule 15 deposition as to a similar distinction.  And the fact that Barclays
    settled with both the government and HP indicates that Barclays likely did not believe that the defendant's
28  conduct fell within the exception for "*bona fide* hedging."

The defendant and the Court may view the defendant's conduct as *bona fide* hedging.  But whether it is *bona fide*—Latin for "good faith"; *see also* Black's Law Dict. 10th ed. (2014) ("1. Made in good faith; without fraud or deceit. 2. Sincere; genuine.")—hedging or frontrunning is an intent question for the jury to resolve.  And there is sufficient evidence in the record—the defendant's own words and actions chief among them—that would permit the jury to conclude that Barclays' hedging was simply not *bona fide*; that it was not done in good faith and without deceit.

The evidence established that Barclays' trading was not a hedge but was instead part of a scheme to move the market adversely to HP, in violation of the bank's and the defendant's representations to the client.  *See*, *e.g.*, Ex. 123, Tr. at 566, 655.  A "hedge" is essentially an insurance policy that protects the holder against a possible market event.  As Topiel testified, a "hedge" is something that eliminates or reduces risk.  Tr. at 129.  The evidence shows, however, that Barclays' traders, at the defendant's direction, were not trading to prepare for the event that market volatility would fall – they were trading for the purpose of moving the market against HP and in favor of Barclays.  *See*, *e.g.*, Ex. 123 ("we get the next clip - significantly lower") and Ex. 127T[4] at 5 (Guganeswaran telling the defendant "we were going to ... spank the market, like good and proper ... so we'd be better on the second clip," to which the defendant assented).  Hedges are put in place to prepare "in case" an event happens.  But activity calculated to *change* events is something entirely different than a hedge – it is the "impetus" prohibited by the Barclays policy and the law.  A hedge against one's bets protects him in the event that the other team wins – it doesn't influence the outcome of the game.

The jury heard considerable evidence that the defendant schemed to change volatility, not merely soften the blow if volatility happened to change.  On September 27, 2011, the defendant instructed Guganeswaran to "offer this fucking shit down."  Exhibit 126.  Minutes later, Guganeswaran told  the defendant that "we were going to call out and just spank the market, like good and proper so we'd be better on the second clip [of the unwind]."  Exhibit 127T at 5.  The second page of Exhibit 123T captures Burrell and Guganeswaran scheming to depress volatility for the purpose of obtaining a more favorable

---

[4] The government refers to the transcripts for ease of reference here, even though the audio—and the jury's understanding of the audio—is what controls.

price on the unwind.  And the conspirators recognized that their efforts were successful: the day after the second tranche, Burrell told Guganeswaran:  "we really, really moved it [volatility]."  Exhibit 141T at 5. On September 30, Guganeswaran told the defendant that "cable has done more 'cause we've done stuff," attributing the decline in volatility to Barclays' trading.  Exhibit 131A, *see also* Tr. at 915-16 (Professor Martin's testimony regarding relative changes in volatility among currency pairs).  Further, Osterman and Professor Martin confirmed that Barclays was likely a cause of the drop in volatility.  Tr. at 681, 930.

But perhaps the strongest evidence that the defendant did not view Barclays' frontrunning of the second tranche merely as a "bona fide" hedge is his email conversation with Guganeswaran on September 30, after volatility had cratered but before the defendant had spoken to HP.  This conversation, which is in the record as Exhibit 134, is short and to the point.  Guganeswaran expressed concern that HP would trade somewhere else:  "he'd better not!"  The defendant was unfazed by the suggestion that HP would use a different bank, saying "If he does we r fine."  When Guganeswaran followed up by saying "As long as he trades somewhere!," the defendant responded "He will.  He has to."

This email undermines the defendant's argument that the intent of Barclays' selling on September 29 and 30 was purely to hedge its risk.  If HP had chosen to use another bank, Barclays would have been extremely short without HP's option to offset its books (*see*, *e.g.*, Exhibit 160, which describes Barclays going over a risk limit on September 30).  In a world where the defendant merely sought to hedge Barclays' risk, this would be a problem: Barclays would have nothing to offset its aggressive hedging.  But the defendant understood that the plan was not simply meant to manage Barclays' risk.  It was to be short ahead of HP's trade, *no matter who* the trade was with, in order to profit from its position.  As Professor Martin explained, because of the depressed level of volatility, Barclays was well-positioned to profit, regardless of who HP traded with.  (Tr. 921-22.)

A rational juror could examine this evidence, including Exhibit 134, and conclude that the defendant's intent was not to hedge Barclays' risk in good faith, but instead to profit by being short ahead of HP's second tranche.  The defendant or the Court may hold a different opinion, but it is the province of the jury to evaluate the record, and determine the defendant's guilt based on the evidence before it.

**B.** **The scheme to depress volatility is criminal because the defendant used material misrepresentations and half-truths to further it.**

Government's Response to Defendant's Motion for a Judgment of Acquittal
18-CR-0021 CRB

1    Had the defendant never spoken to HP, the government's sole basis for a wire fraud charge would

2    be misappropriation.  But the defendant *did* speak to HP again and again before, during, and after the

3    unwind, and a rational jury could find that his statements were false and that they were material.  The

4    defendant and this Court may disagree, but decisions about contested evidence are for the jury to make.

5                    **1.    The Defendant's Misrepresentations**

6    On September 27, 2011, the defendant told Nesper that Barclays was not touching the market.

7    "[Barclays traders] are not doing anything."  Exhibit 115T.  Three days later, the defendant repeated this

8    pledge in in the call transcribed as Exhibit 139T: "I could also pretty much guarantee you that even if you

9    didn't want to [transact] not one person on this staff, not one of my traders, is going to go anywhere near

10   that market because I'm going to tell them not to."  Nesper understood this to mean "moving [the market]

11   intentionally in a way that's adverse to us, trading on the bank's own account rather than for us."  Tr. at

12   269.  Topiel also understood this to mean that Barclays would not be trading in a way that would influence

13   or affect HP's underlying position.  Tr. at 223-24, 233-34.  And both Waller and Professor Martin had

14   similar understandings.  Tr. at 98, 868-69.  Coupled with Barclays' prior, express statements, as well as

15   the context in which Barclays employees made them, this would allow a juror to conclude that the

16   defendant was making such a promise.

17   The fact that Barclays and HP engaged in extensive discussions about how to trade in a way that

18   avoided market impact makes it reasonable for Nesper to interpret the defendant's statements as a promise

19   not to intentionally depress the market.  In its presentation dated September 6, 2011 (Exhibit 173B),

20   Barclays recommended that a strategy of executing the unwind in 3-4 tranches "is least likely to move the

21   markets and will be the most cost-effective for [HP]."  Exhibit 173B at 7.  Topiel understood Barclays'

22   statement that it would employ a "quiet execution strategy," to mean "doing smaller pieces from the

23   trading side as well so that it wouldn't – the trading side of the business so it wouldn't influence the price

24   of the market too heavily."  Tr. at 141.

25   Two days later, Barclays sent HP a presentation, which had been approved by the defendant, Tr.

26   at 144 & Ex. 141A.  That presentation provided advice on how HP should proceed should it decide to seek

27   prices from other banks, which Barclays recommended against doing.  Ex. 112B.  Topiel testified that the

28

Government's Response to Defendant's Motion for a Judgment of Acquittal
18-CR-0021 CRB

strategies outlined in Exhibit 112B were calculated to prevent market participants from trading in a way that would hurt the client.  Tr. at 141.  If market actors learned of HP's intentions, they could use the company's confidential information to trade in a way that would devalue the options.  Tr. at 141.

During the September 27 call, the parties discussed how much volatility levels would move as a result of the trading and the defendant stated:  "I wouldn't anticipate moving it more than, I mean, I'm just going like off the top of my head, I wouldn't anticipate moving it like more than 60 or 70 points."  115T at 5, 6.  Later, the defendant suggested that Barclays' competitors may not have HP's "best interests" at heart.  *Id*. at 11.  This extensive discussion of how to trade in a way that avoids putting another bank in a position to move the market against HP suggested that Barclays itself would not do the same.

The defendant's statement that he would not intentionally depress the price of volatility led him to misrepresent Barclays' cable vega position to Nesper.  This is because a short position could have revealed that Barclays was selling in a manner calculated to depress volatility, and could have encouraged Nesper to move up the second tranche and prevent Barclays from frontrunning it.  Tr. at 904-05.  Further, Nesper had no way to know Barclays' book position or trading data, Tr. at 233, 317; he testified that when he asked for it, he was rebuffed.  Tr. at 508-09.[5]  And Barclays represented, in a presentation the defendant had approved, that the winner of the unwind would be trying to "clear its long position."  Ex. 112B at 2.  Topiel testified that this meant clearing the position from long to flat.  Tr. at 149.  So did Nesper.  Tr. at 510-11.

This is a crucial point that will likely be elucidated in closing arguments.  In the September 27 call, the defendant explained that Barclays might be able to clear its risk within an hour or two.  Exhibit 115T at 12, 13.  According to the defendant, while other banks were pricing the unwind with "you can't do anything for like 2 days while I have this," Barclays' ability to clear its risk quickly was presented as an advantage for HP, which might have the opportunity to unwind the second tranche earlier in order to take

---

[5] The defendant may point out that, according to Exhibit 197, Barclays traders are encouraged not to share the bank's proprietary positions.  But the defendant is not accused of complying with that policy and omitting a material fact.  He is accused of *lying* about a material fact.  As Barclays' head of compliance testified, once an employee starts talking to a client, he is not permitted to lie.  Tr. at 827.  If the defendant had told Nesper that he could not share information about the bank's position, this would be a different case.  But he did not do that; instead, he opened his mouth and lied.

Government's Response to Defendant's Motion for a Judgment of Acquittal
18-CR-0021 CRB

1    advantage of favorable market position; indeed, the defendant told HP that someone from Barclays would

2    be on the phone with HP to deal the second tranche if that happened.  According to the data, Barclays

3    reached a short position at 8:12am ET on September 29, less than 23 hours after the unwind of the first

4    tranche.  (Tr. at 884, Ex. 164.)  Had HP unwound at that time or shortly thereafter, Barclays would not

5    have had the opportunity to get shorter, and HP would have benefitted from the fact that volatility levels

6    had not yet fully crashed.  Further, Barclays would not have had the opportunity to sell its own options at

7    a high price prior to manipulating the market downward.  *See* Ex. 127T at 3 (Guganeswaran telling

8    defendant that "I can affect Bloomberg but I haven't done it yet … I think [] I can try and skew Bloomberg

9    down but I've not done that yet cause I need to get some options out first before I do that.").

10         In order to ensure that HP did not attempt to deal early, the defendant and his co-conspirators

11    needed HP to wait.  The defendant expressed concern to Guganeswaran on September 29 that HP might

12    want to trade soon.  (Ex. 126T at 2.)  Guganeswaran told the defendant that "we need to tell [HP] to give

13    us the full 48 hours like you said yesterday."  (Ex. 127T at 2.)  The defendant then told HP that it "might

14    be best to wait."  (Ex. 125.)  Guganeswaran then told his junior traders that "the only danger with" the

15    gameplan to lower volatility would be HP wanting to trade earlier.  (Ex. 123 at 9/29 14:51:15 UTC.)

16    Minutes later, Guganeswaran told his traders that "rob basically says we're waiting to tomorrow … so

17    think we stick to teh (*sic*) gameplan above."  (*Id*. at 9/29 14:56.)  Meanwhile, the defendant told HP that

18    he "will be watching mkt like a hawk and if I see a window as I said all along, I will call you and advise

19    to trade, and at that pt its up to you."  (Ex. 125 9/29 14:40:56.)  The defendant never did so because there

20    was no window; there was no such window because his traders, on his orders, were driving down the price

21    of volatility.

22         Given HP's eagerness to deal, in order to buy time, the defendant and Guganeswaran

23    misrepresented Barclays' book position.  At 9:17 a.m. on September 29, Guganeswaran told the defendant

24    "basically we are short 500k vega right now."  Exhibit 124T at 2.  <u>One minute later</u> the defendant told

25    Nesper: "we are still long a little bit of vega."  Exhibit 125 at 1.  The defense suggested during opening

26    and cross-examination that the defendant interpreted Guganeswaran to be communicating the bank's cable

27    vega position to him, while he communicated the bank's overall vega position to Nesper.  Nesper testified

28

Government's Response to Defendant's Motion for a Judgment of Acquittal
18-CR-0021 CRB

that he interpreted this statement to refer to Barclays' cable position and ample evidence supports this conclusion. Tr. at 524. Whether or not the defendant intended to communicate the bank's overall position to Nesper is a matter of interpretation that must be resolved by the jury.

Importantly, a rational juror could determine this statement to be false. First, as a matter of fact, the data indicates that Barclays was short cable vega at 9:18 a.m. (*See* Ex. 164, Tr. at 886-87.) Second, given the one-minute difference, the jury could conclude that both conversations communicated the bank's cable position. This conclusion is supported by the fact that the defendant and Guganeswaran used nearly identical terminology to articulate the bank's vega position – Guganeswaran said that the bank was short vega and Bogucki relayed that the bank was long vega. The similar terminology expressed during the one-minute window, the repeated references to "GBP" volatility on the first page of Exhibit 125, alongside Guganeswaran's references to "quid" – a Britishism for Sterling, Tr. at 888, indicate that the defendant was referring to the British Pound when he said that Barclays was long. Further, it is utterly unclear why Nesper—who was engaged in a Sterling-related transaction—would care about other currency risk exposures, and why the defendant would care to tell him in a week where their conversations were dominated by cable. Finally, the Court must interpret Exhibit 125 in a light most favorable to the government, and such an interpretation is that the defendant was talking about cable – not overall – vega. A rational juror could find this statement to be false.

On September 30 at 10:45 a.m., on a call with HP, Guganeswaran advised HP that Barclays had sold "four fifths" of the risk associated with the first tranche. Exhibit 136T at 12. Professor Martin testified that the data did not support this assertion. Tr. at 923-24. Indeed, even under an interpretation favorable to the defendant, this statement was clearly false; Barclays was significantly shorter at that point than it had been prior to the first tranche. Ex. 164, Tr. at 914. Guganeswaran knew Barclays was short "3.2 quid" because he told Bogucki this before the call. Ex. 133T at 1, Tr. at 919.) Nesper interpreted this statement as communicating that Barclays was net long. Tr. at 290.

After the call, Guganeswaran twice reminded the defendant that he told HP that Barclays was four-fifths complete. Exhibit 137 ("I checked with my trader(!) and said 4/5. Just so you know") and Exhibit 138T at 2 ("[HP] asked me how much of the first clip we've done and I said 4/5"). Viewing this evidence

1    in the light most favorable to the government, the jury could conclude that Guganeswaran advised the

2    defendant of his "4/5" comment because it was not true.  The defendant would need to know of the lie so

3    he would not say something different during his next conversation with HP, and risk exposing the scheme.[6]

4          In order to conceal the scheme, the defendant further needed to misrepresent what was causing the

5    decline in volatility, by attributing it to changes in the S&P 500 and to other banks' trading.  For example,

6    he repeatedly attributed the decline in volatility to the stock market: "GBP vol is lower because after

7    selling only 450, the market has rallied 16 pts in s/p . . . Its really more dependent on what [the S&P 500]

8    and risk overall does . . . hate to keep dropping [the S&P 500 but its driving everything."  Ex. 125.  But

9    the evidence indicates that the S&P 500 was not a major reason for the decline in volatility during this

10   time, and the stock market's movements did not correlate with volatility's.  Tr. at 892-97, Ex. 186.

11   Nowhere in their internal calls or chats do the defendant or his traders attribute the fall in volatility to the

12   stock market.  And the defendant said that Barclays had sold "450" just a few seconds after Guganeswaran

13   told him they had sold 600 pounds of options, and acknowledged to Guganeswaran that he was not going

14   to tell HP the truth and was misrepresenting how much Barclays had sold.  Ex. 124T at 2.

15         On September 30, the defendant spoke with HP after volatility had precipitously declined.  Asked

16   for a recap on the state of sterling volatility Ex. 139T at 2, the defendant told HP "I'll tell you straight up

17   what we've done."  The defendant then proceeded to say that "we've sold approximately a yard of your

18   interest. We've taken on two yards of your interest, and we've sold stuff around it … and then everything

19   else that we've sold has pretty much been in other currency pairs … when the bid got weak in Sterling we

20   just sort of stopped."  Ex. 139T at 3.  The defendant repeated later that half of HP's first tranche was still

21   in Barclays' inventory, which Nesper understood to mean that Barclays was still selling out of the first

22   tranche and was still long.  *Id*. at 5; Tr. at 327.  When Nesper asked, twice, for the defendant to let him

23

24   _____

     [6] It is settled law that "while each conspirator is part of the conspiracy, he is responsible for his
25   coconspirators' acts committed pursuant to and in furtherance of the conspiracy."  *United States v.*
     *Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979).  In any event, the defendant was aware *prior* to the call that
26   Guganeswaran would be talking to HP in his absence.  In Exhibit 135, he told Guganeswaran to be
     "straight and super careful."  This can be read this in two ways – that the defendant was cautioning
     Guganeswaran because he knew Guganeswaran would have to misrepresent the state of the market and
27   Barclays' trading, or that he was simply instructing Guganeswaran to tell the truth.  In our system, it is up
     to the jury—based on the context and the defendant's other words and actions—to determine which
28   interpretation of the evidence is persuasive.

     Government's Response to Defendant's Motion for a Judgment of Acquittal
     18-CR-0021 CRB

1    know if he saw other sellers of volatility in the market, the defendant told Nesper that he would, but did

2    not bother to mention that the most aggressive seller of volatility, by far, was Barclays.  *Id.* at 5, 15.

3        A jury could find that these statements are misleading half-truths, which this Court has stated are

4    actionable under the wire fraud statute.  Dkt. No. 93; *see also United States v. Montgomery*, 384 F.3d

5    1050, 1063–64 (9th Cir. 2004) (holding that a statement is false if it is half true or conceals facts or

6    information necessary to make the statement as a whole not misleading); *Lustiger v. United States*, 386

7    F.2d 132, 138 (9th Cir. 1967) ("the deception need not be premised upon verbalized words alone. The

8    arrangement of the words, or the circumstances in which they are used may convey the false and deceptive

9    appearance.").  Rather than explain what actually caused the decline in volatility—Barclays' intentional

10   plan to lower volatility by selling options aggressively—the defendant consistently offered other excuses

11   to distract Nesper.  Confronted with a request to help find the culprit, the defendant promised he would

12   assist, again ignoring what he knew to be true: that Barclays was the reason for volatility's decline.  *See*

13   *also Beecroft*, 608 F.2d at 757 ("One who acts with reckless indifference to whether a representation is

14   true or false is chargeable with knowledge of its falsity.").

15       Based on the evidence, a jury could find that these misrepresentations and half-truths were

16   material.  "Materiality is a question of fact for the jury."  Ninth Circuit Model Criminal Instruction 8.121

17   cmts. (citing *United States v. Carpenter*, 95 F.3d 773, 776 (9th Cir. 1996)).  "A false promise, statement

18   or representation is material if it is made to induce action or reliance by another or has a natural tendency

19   to influence or is . . . capable of influencing another's decision." *United States v. LeVeque*, 283 F.3d 1098,

20   1103–04 (9th Cir. 2002).  Nesper explained that these representations were capable of influencing his

21   decisions during the period of the unwind.  *See generally* Tr. at 327-29, 334-36.  This information would

22   be significant, not least because HP had important business decisions to make—about who to unwind

23   with, what spread to agree upon (if any), and who to work with in the future.  *See*, *e.g.*, Tr. at 336, 905.

24       These misrepresentations and half-truths deceived HP about Barclays' trading and the state of the

25   market.  There is sufficient evidence to allow a rational juror to conclude that the defendant "intentionally

26   deprived [HP] of the opportunity to decide for themselves, on the basis of true and accurate information,

27   whether or not to" trade with Barclays.  *United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2010).

28

Government's Response to Defendant's Motion for a Judgment of Acquittal
18-CR-0021 CRB

1

## 2. Evidence of the Defendant's Intent

2   Intent is the key issue in this case. "It is settled law that intent to defraud may be established by

3   circumstantial evidence." *Rogers*, 321 F.3d at 1230. "Intent need not be established by direct evidence,

4   but may be inferred from the defendant's statements and conduct." *Beecroft*, 608 F.2d at 757. Indeed,

5   "the scheme itself may be probative circumstantial evidence of an intent to defraud." *Sullivan*, 522 F.3d

6   at 974. There is ample evidence in the record to allow a jury to conclude that the defendant acted with

7   wrongful and fraudulent intent.

8   First, the misrepresentations and half-truths themselves point to the defendant's intent. *United

9   States v. Lothian*, 976 F.2d 1257, 1267-68 (9th Cir. 1992) (inferring intent to defraud from

10   misrepresentations); *Rogers*, 321 F.3d at 1230 (same). The defendant would have had no reason to

11   misrepresent the state of Barclays' book, the nature of its trading, or the causes of the decline in volatility

12   if he believed that everything he was doing was legal and permissible. A jury could examine these

13   misrepresentations and conclude that they point to fraudulent intent.

14   Second, the defendant's statements to his co-conspirator during the course of the scheme provide

15   a basis for a jury to gauge his state of mind. For example, the defendant said that he was being "straight

16   to a limited extent" in his conversations with HP. Ex. 124T at 5. A jury could conclude that the defendant

17   acknowledged he was not being truthful with HP. The defendant also instructed Guganeswaran that "you

18   and me need to independently stick to the story of, you know look um, in the last, like, you know...you

19   just say like look, you know, we haven't been offering the cable curve, other banks have." Ex. 131T at 4.

20   This evidence of concealment and cover-up speaks to the defendant's intent.

21   That this "story" was just a story—not the truth, but fiction—is crucial to assessing the defendant's

22   intent. The idea that Barclays was "not offering the cable curve" – not selling cable options – is absurd

23   and unsupported by the data and testimony. Tr. at 917-18, Ex. 166. It also contradicts the defendant's

24   orders to "be on the offer on shit" and "offer this fucking shit down." And the idea that "other banks

25   have" is belied by the data (Tr. at 925, 932-35; Ex. 198), and by the defendant's October 3 statement that

26   "I don't think anybody has any clue or whatever" (Ex. 140T at 12). *See also* Ex. 125 at 2, Tr. at 284

27   (defendant stating that he did not think other market participants knew that HP was unwinding). A

28

Government's Response to Defendant's Motion for a Judgment of Acquittal
18-CR-0021 CRB

1  reasonable juror could examine these statements and conclude that the defendant acted with fraudulent

2  intent.

3        Third, the jury can consider the way the defendant discussed HP.  Immediately after his September

4  27 call with Nesper, the defendant told Guganeswaran that Nesper "knows we made a ton of money on

5  the first part and he is just fucking fuming over it.  Okay, so just, we gotta play with that." Ex. 116T at 4.

6  The defendant explained that he'd be willing to let Nesper "tattoo [him] for 500 grand to feel better about

7  himself."  *Id*.  A jury could understand this statement to mean that the defendant was willing to lull HP

8  into a tighter spread and better price, because in any event, Barclays' real profits would come from

9  frontrunning.  Then, on September 30, the defendant made two statements about the "other banks" alibi

10  he planned to use to distract HP.  First, he told Guganeswaran that "you wanna feed those other mouths,

11  it's gonna fucking cost you." Ex. 132T at 2.  Several hours later, he told Guganeswaran that "I have to

12  tell him in a very nice way that instead of letting us fuck you for three or four million dollars, you perfectly

13  supervised the market at large fucking you in the ass for 25, so congratulations." Ex. 138T at 2.  A rational

14  juror could determine that the defendant was telling his co-conspirator that a consequence of HP daring

15  to consider using other banks—*i.e.*, not Barclays—was that Barclays would frontrun HP's trade.

16  Essentially, in the defendant's view, HP had two choices: pay Barclays more upfront ("let[] us fuck you

17  for three or four million dollars") or Barclays would frontrun the trade ("the market at large fucking you

18  in the ass for 25").  The defendant may propose an alternative, less incriminating explanation.  Either way,

19  that determination is for the jury to make.

20        "It is often difficult to prove fraudulent intent by direct evidence and it must be inferred in such

21  cases from a pattern of conduct or a series of acts, aptly designated as badges of fraud." *Lothian*, 976 F.2d

22  at 1267.  Here, the defendant's actions and words—and the goal of the scheme itself—offer a sufficient

23  basis for a rational jury to conclude that he acted with fraudulent intent.

24       **C.**    **Misappropriation of Confidential Information**

25        There is sufficient evidence for a jury to conclude that Barclays traded on HP's confidential

26  information.  Whether or not HP and Barclays' relationship constitutes a qualifying relationship of trust

27  and confidence is a matter of fact for the jury to decide. *United States v. Milovanovic*, 678 F.3d 713, 728

28

1   (9th Cir. 2012) (*en banc*); *United States v. Johnson*, 16-cr-457, 2017 WL 5125770, at *3-4 (E.D.N.Y.

2   2007) (whether a trust relationship existed between HSBC and its FX customer is a matter of fact for the

3   jury).  In Exhibit 115T, the defendant promised to keep HP's information confidential ("this will be kept

4   very quiet," p.25), and *Carpenter v. United States*, 484 U.S. 19, 25 (1987), makes clear that a promise of

5   confidentiality, without more, is sufficient to establish a heightened duty.[7]

6           Additional evidence supports the understanding that the defendant was obligated to protect HP's

7   confidential information.  The defendant received an email advising him of "a policy that you all know

8   about" – "if we are working on any sensitive client situation, either because the underlying transaction is

9   sensitive or the FX market effect of said transaction is sensitive, it cannot be discussed with ANYONE

10  who is not specifically involved in the transaction..."  Exhibit 104.  Even absent a formal duty, the "FX

11  market effect" was, in Barclays' view, sufficient to confer an obligation of confidentiality.  In Exhibit

12  112B and other communications with HP (*e.g.*, Exs. 157, 173B), Barclays emphasized the importance of

13  confidentiality in the transaction.  On the September 27 call, the defendant repeatedly referenced HP's

14  "best interests" in providing advice and agreed to provide a "trust type exit," and the defendant said on

15  multiple occasions that a breach of confidentiality would be a serious offense.  *See* Ex. 115T at 25 ("it

16  would be a fire-able offense otherwise with any of my guys.  So don't worry about that"); Ex. 124T at 5

17  ("it will go straight to [senior Barclays official] Skip McGee and your ass will be in a fucking frying pan

18  in November"); Ex. 139T at 5 ("I know who's at my bank and the guys at my bank know that if anybody

19  were to breathe a word of anything to anybody, they're done.  It's like, you're not working here, like

20  within an hour.").  Nesper certainly understood that Barclays would protect HP's confidential information.

21  Tr. at 326, 333-34.  And the two Barclays employees involved in the transaction—Topiel and Osterman—

22  also understood the importance and obligation of confidentiality surrounding this information.  Tr. at 137,

23  141, 145, 233, 693-94.  A jury could find a duty of trust and confidence based on this evidence.[8]

24

25          [7] *United States v. Hedaithy* provides an example in which the defendant defrauded the victim by
    misappropriating the victim's confidential information even in the absence of a heightened duty.  392 F.3d
26  580, 595-96 (4th Cir. 2004).  Liability there attached to the defendant's broken promise not to misuse
    confidential information, not his breach of a duty.

27          [8] The defendant has suggested at various points that this duty applied only to Barclays sharing with
    other banks.  First, it is unclear why Barclays would share this information with other banks even absent
28  a duty, given that doing so would be against Barclays' interest and allow other banks to make money.

1    Further, even if Barclays did not owe HP a duty *before* the unwind, a jury could determine that it

2    did after HP traded the first tranche.  At that point, Barclays knew—for a fact—that HP was unwinding,

3    and that HP had 4 billion pounds to go.  This was a serious informational advantage, as the defendant

4    acknowledged: "because we have the benefit of knowing, through working with you on this transaction,

5    that when you say 'Look, I wanna price on 4 yards,' we know it's 4 yards and that's it." Ex. 139T at 6.

6    That Barclays had this information put HP in a tough spot in which Barclays had leverage over HP.  Tr.

7    at 277.  Indeed, even the defendant recognized that HP was facing a "catch-22."  Ex. 139T at 6.

8    Much has been made of whether Nesper "let the cat out of the bag" by sharing too much

9    information with Deutsche Bank and BNP Paribas.  But the details of HP's unwind, specifically the size

10   of the options and timing of the unwind, were confidential and not widely known.  Tr. at 334, 497, 132-

11   33, 154.  And there is no evidence in the record that HP shared any information with any other bank

12   between the unwind of the first tranche and the collapse in volatility; indeed, the evidence is that while

13   Nesper engaged in detailed communications with the defendant on a daily basis, he did not share

14   substantive information with BNP Paribas or Deutsche Bank.  *See*, *e.g.*, Tr. at 499-500.  This evidence is

15   sufficient to submit the matter to the jury.

16   The defendant has tried to portray Nesper as a bluffer and an unsympathetic victim.  (The victim,

17   in fact, is not Nesper, but HP and its shareholders.)  In a fraud case, "[w]hat is important is the intent of

18   the person making the statement that it be in furtherance of some fraudulent purpose."  *United States v.*

19   *Halbert*, 640 F.2d 1000, 1009 (9th Cir. 1981) (per curiam).  The Ninth Circuit has repeatedly held that

20   "the wire-fraud statute protects the naive as well as the worldly-wise."  *United States v. Ciccone*, 219 F.3d

21   1078, 1083 (9th Cir. 2000) (citations omitted).[9]  The government submits that Nesper, who had never

22

---

23   Second, the duty is broad in the way it protected HP.  Imagine a situation where a homeowner hires a
     security company to install an alarm system and provides them with the code to the alarm.  No doubt, the

24   security company cannot give the alarm code to prospective burglars or post it on social media.  But the
     security company *also* cannot use the code to enter the home and steal the homeowner's belongings; it

25   may only use the code for legitimate reasons, such as if the alarm is triggered by a burglar or to make
     repairs.  This is the essence of a duty: the understanding that confidential information is given for a limited

26   purpose, not to be used adverse to the customer's interest.

27   [9] In *United States v. Benson*, the court noted that the victim was a convicted felon, and the
     "defendants argued to the jury that he was a smuggler and a jewel thief."  Yet "the jury found that he was

28   the victim of a swindle."  48 F.2d 42, 47 (2d Cir. 1997).  In a criminal case, the identity of the victim is
     not dispositive, though it may be one factor the jury must take into account.  The *Benson* panel further

     Government's Response to Defendant's Motion for a Judgment of Acquittal
     18-CR-0021 CRB

1    traded an FX option before this large transaction, Tr. at 249-50, was naïve, and the defendant contends

2    that Nesper was worldly-wise.  To the degree that his knowledge and sophistication are at issue, they are

3    matters for the jury to weigh: is he a crafty know-it-all at a Fortune 500 company, or a businessman in

4    over his head in a world of traders who deal in complex derivatives all day, every day?

5         But his bluffing does not mean that HP cannot be a victim.  A recent case in front of Judge Alsup

6    is illustrative.  In *United States v. Brugnara*, No. 14-0306 WHA (N.D. Cal. Oct. 9, 2015), 2015 WL

7    5915567 at *12.  Judge Alsup recognized that even if the victims of a fraud "had been trying to reciprocally

8    defraud Brugnara, that would not have negated any of the elements of wire fraud and would not have been

9    a defense (although it would have gone to their credibility, as the jury was instructed)."  *Id*.  And indeed,

10   Judge Alsup correctly instructed the jury that:

11   > If the government proves that the defendant committed wire or mail fraud beyond a reasonable
12   > doubt, it would not matter whether any alleged victim of the scheme was trying to defraud the
     > defendant, trying to defraud someone else, or was negligent in some manner. The crimes of wire
13   > or mail fraud are complete upon the occurrence of all four elements of the crime. If, however, you
     > find that an alleged victim acted dishonestly or carelessly in any way, then you may consider such
14   > conduct in evaluating the credibility of his or her testimony, giving it such weight as you think it
     > deserves, taking into account all of the facts and circumstances shown by the evidence.

15

16   *Id*. at *5, *see Brugnara* at Dkt. No. 601 (Judge Alsup's charge to the jury).  The Ninth Circuit affirmed,

17   noting that the victim's "alleged conduct, even if true, has no bearing on the elements of [the defendant's]

18   crimes.  It is not material who approached whom or whether she intended to defraud him.  [The victim's]

19   actions do not change the fact that [the defendant] knowingly made false representations meant to deprive

20   her and [another victim] of their property."  *United States v. Brugnara*, 856 F.3d 1198, 1208 (9th Cir.

21   2017).   Nesper's knowledge about the market and lack thereof, alongside his "bluffing," should be

22   evaluated by the jury, and the defendant is free to argue that his conduct undermines his credibility as a

23   witness.  But those credibility findings are reserved for the jury, and are not an appropriate basis for a pre-

24   verdict judgment of acquittal.  *See United States v. Alarcon–Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002)

25   ─────────────────────

26   stated that "[w]hile it is generally held in a civil suit where both parties are guilty of criminal behavior
     with respect to the cause sued upon, that the court will leave the parties where it finds them and refuse to
27   act as a referee among thieves, a criminal action is on a manifestly different footing."  Even accepting the
     defendant's portrayal of Nesper, this case should go to the jury.

28

     Government's Response to Defendant's Motion for a Judgment of Acquittal
     18-CR-0021 CRB

1    ("it is not the district court's function to determine witness credibility when ruling on a Rule 29 motion").

2    **II.    The Defendant's Other Arguments Are Not Rule 29 Issues**

3        The defendant has suggested that this case presents a "due process problem," because the

4    defendant was not on sufficient notice that his conduct could be criminal.  *See*, *e.g.*, Tr. at 1013.  First,

5    Rule 29 is not the appropriate vehicle for resolving the question of whether the charges in the superseding

6    indictment pose a notice problem.  Second, the defendant raised this argument during trial (Dkt No. 210)

7    and following the attachment of jeopardy, which puts the government in a difficult position: should this

8    Court issue a ruling limiting the ambit of the wire fraud statute on due process grounds, the government

9    will be unable to request that the Court reconsider, or alternatively, appeal its ruling.[10]

10       But most important, the Court should reject the argument because the wire fraud statute applies to

11   a broad array of schemes.  "The Supreme Court has interpreted § 1343 broadly and twice held that

12   individuals who retain or misappropriate the money or property of others, regardless of how they acquired

13   it, fall within the purview of mail or wire fraud."  *United States v. Jones*, 472 F.3d 1136, 1139 (9th Cir.

14   2007).  Indeed, the courts interpret the federal mail and wire fraud statutes broadly precisely because

15   Congress cannot possibly foresee every new variation of fraud.  *See United States v. Maze*, 414 U.S. 395,

16   407 (1974) ("[t]he criminal mail fraud statute must remain strong to be able to cope with the new varieties

17   of fraud that the ever-inventive American 'con artist' is sure to develop") (Burger, J. dissenting).  And

18   the theories that the government proceeds on—misappropriation, lying to a customer or counterparty, and

19   deprivation of the right to control assets—are neither novel nor complex.  The defendant is charged with

20   conduct—using another's confidential information, and lying about it—that is well within the boundaries

21   of the wire fraud statute.  The Court should reject the defendant's due process argument entirely.

22       On a related note, the defendant and the Court have also expressed concern about the lack of an

23   applicable regulation in this context.  It is true that there is no evidence in the record of a regulation

24   covering this conduct.  This is because a regulatory violation is not an element of wire fraud.  The Ninth

25

26       [10] Defense counsel has claimed that the government is "mislead[ing]" the Court and the jury.  Tr.
27   at 1028-29, 1030.  The government recognizes and respects that counsel is a zealous advocate for his
     client.  However, there is no basis for the claim that the government has ever misled anyone about the
28   nature or scope of this case, or what the evidence shows.

Circuit has stated that "it is settled that wire fraud does not require proof that the defendant's conduct violated a separate law or regulation, be it federal or state law . . . A defendant's conduct need not otherwise be illegal in the sense that the government must also prove that the defendant's conduct violated a specific statute or regulation." *United States v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010).  While there are regulations that covered the defendant's conduct, they are not in the record, and were not introduced because they are irrelevant to the question of whether the defendant committed wire fraud.[11]  The regulation issue is a red herring, and its relevance to this case is limited at best.

## CONCLUSION

This case has been extensively litigated for over a year, and the government respects this Court's concerns about the nature of the case.  But at this stage of the proceedings, it is the evidence in the record that controls, and the sole issue before the Court is the sufficiency of that evidence.  The government has produced sufficient evidence to permit a rational jury, drawing inferences in favor of the government, to return a guilty verdict.  This Court has selected and sworn a rational jury, which has patiently listened to and engaged with this evidence over the course of two weeks.  This jury should be permitted to complete its sworn duty and reach a verdict—whether guilty or not—based on the evidence.

Dated: March 2, 2019

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

ROBERT ZINK
Acting Chief, Fraud Section
Criminal Division

/s/
BRIAN R. YOUNG

---

[11] The Office of the Comptroller of the Currency promulgated a final rule effective July 15, 2011 (12 C.F.R. Part 48) concerning retail FX transactions such as this one.  It is a "final rule authorizing national banks, Federal branches and agencies of foreign banks, and their operating subsidiaries to engage in off-exchange transactions in foreign currency with retail customers." 76 Fed. Reg. 41375 (July 14, 2011).  This rule requires banks "to establish reasonable policies, procedures, and controls to address front running. This provision is designed to prevent the national banks from unfairly taking advantage of information they gain from customer trades." 76 Fed. Reg. 41382.  The government did not introduce evidence of this rule because it is irrelevant to the wire fraud charge, per controlling Ninth Circuit precedent.

Government's Response to Defendant's Motion for a Judgment of Acquittal
18-CR-0021 CRB

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JUSTIN D. WEITZ
Assistant Chiefs, Fraud Section

CHINHAYI COLEMAN CADET
Assistant United States Attorney

Government's Response to Defendant's Motion for a Judgment of Acquittal
18-CR-0021 CRB