Sean Hecker (*pro hac vice*)
Derek Wikstrom (*pro hac vice*)
Alexandra Conlon (*pro hac vice*)
Abra Metz-Dworkin (*pro hac vice*)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue
Suite 7110
New York, NY 10118
Tel: (212) 763-0883
shecker@kaplanhecker.com
dwikstrom@kaplanhecker.com
aconlon@kaplanhecker.com
ametz-dworkin@kaplanhecker.com

Josh A. Cohen (SBN 217853)
Adam F. Shearer (SBN 279073)
CLARENCE DYER & COHEN LLP
899 Ellis Street
San Francisco, CA 94109
Tel: (415) 749-1800
Fax: (415) 749-1694
jcohen@clarencedyer.com
ashearer@clarencedyer.com

Attorneys for Defendant
ROBERT BOGUCKI

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR-18-0021 CRB |
| Plaintiff, | **ROBERT BOGUCKI'S RESPONSE TO GOVERNMENT'S OPPOSITION TO RULE 29 MOTION** |
| v. | |
| ROBERT BOGUCKI, | |
| Defendant. | |

Despite multiple admonitions from the Court, uncontroverted documentary evidence, and the testimony of its own witnesses, the government continues to insist that a juror could plausibly determine that Mr. Bogucki committed a crime. But only a juror blinded by the government's misinformation campaign could convict Mr. Bogucki as charged. Properly understood, the evidence adduced at trial doesn't just fall short of the Rule 29 standard; it establishes that Mr. Bogucki is innocent.

## ARGUMENT

### I.   There Was Nothing Wrong, Let Alone Criminal, About the Trades

The government still refuses to acknowledge that the trades Barclays placed were entirely lawful and proper. That core, fundamental truth is the reason the government's case fails. Because the trading was appropriate, there was no conspiracy, there were no criminal misrepresentations, and there was no fraud.

As the government conceded on Thursday, there were no regulations or specialized rules during the relevant period that governed FX options trading or prohibited an FX options trader from pre-hedging a potential counterparty transaction.[1] The only writing that even arguably addressed the propriety of trading ahead was an internal Barclays policy from 2006 – which the government produced on the penultimate day of its case – that applied on its face to "transactions in fixed income and equities securities, as well as their derivatives." Ex. 195, at 1. Assuming for the sake of argument that this policy was relevant,[2] it expressly allowed "bona fide hedges

---

[1] The government belatedly and implausibly claims that it simply declined to introduce evidence of regulations because they are "irrelevant," but that "there are regulations that covered the defendant's conduct" that are "not in the record." Opp'n at 22 & n.11 (citing 76 Fed. Reg. 41375 (July 14, 2011)). That purportedly relevant regulation, by its terms, applied to "retail customers." *Id.* But HP was not a retail customer. The regulation expressly states that "[a] retail customer is a person that is not an 'eligible contract participant' under the CEA [Commodities Exchange Act]." 76 Fed. Reg. 41375, 41375 n.5. HP had an ISDA agreement, Ex. 149, and *was* an eligible contract participant under the CEA.

[2] The government contended that the policy applied to FX options trading because, as a matter of corporate organization, the FX options trading function at Barclays resided within the fixed-income division of the bank. But the policy governs "*transactions* in fixed income and equities securities" – and an FX options trade is neither.

1  (opposite side of the market)" of "the risk that is assumed or agreed to be assumed in facilitating
2  the execution of a related transaction." *Id.* at 8.  Even if it were constitutional to convict a criminal
3  defendant of violating a company policy – which, of course, it is not – there was no such violation
4  here.

5  Given the absence of any rule, regulation, or pertinent policy statement, the government
6  has sought to prosecute Mr. Bogucki for violating a "duty of trust and confidence."  But this
7  theory fares no better.  First, it is an effort to apply a rule – Rule 10b-5 – that governs securities
8  transactions but not FX options trades.  *See* Dkt. 206 (Def.'s Legal Memo re Use of Confidential
9  Information for Commercial Advantage).  Second, it is an effort to apply a *de facto* and wholly
10 concocted theory of fiduciary duty in a situation where the government concedes that a fiduciary
11 duty did not exist.  Contrary to the government's repeated assertions, a heightened duty of "trust
12 and confidence" does not arise every time a principal tells a counterparty it will look out for the
13 latter's "best interests."  The government's pet case, *Carpenter*, does not hold otherwise.
14 *Compare* Opp'n at 18 (arguing that *Carpenter* "makes clear that a promise of confidentiality,
15 without more, is sufficient to establish a heightened duty") *with Carpenter v. United States*, 484
16 U.S. 19 (1987) (holding that an employee owed a duty to his employer not to misappropriate
17 confidential information).[3]  Third, it is an effort to rewrite the rules of arm's-length commercial
18 affairs by creating a universe in which one party is free to "bluff" and "BS" about highly material
19 information (*i.e.*, price), RT 451-57, but the other party can be held, under penalty of criminal
20 prosecution, to a standard of literal rectitude.  And for reasons one, two, and three, it is really an

---

[3] The Third Circuit's decision in *United States v. Hedaithy*, 392 F.3d 580 (3d Cir. 2004), is equally unenlightening.  There, the defendants were alleged to have violated express, signed confidentiality agreements in which they "agreed to preserve the confidentiality" of the information at issue.  *Id.* at 595.  Here, there was no such agreement – and even if there had been, there is no allegation, let alone evidence, that Mr. Bogucki shared any information outside the bank.

effort by the government to mislead the jury into believing that Mr. Bogucki owed a duty that he legally did not owe.

None of the evidence admitted in the government's case plausibly supports the government's charge that Mr. Bogucki committed a crime because Barclays traded ahead of the unwind. Though the government's "expert," William Martin, defined frontrunning as "something that you should never do" in "every market that I've been involved in," RT 858, Mr. Martin was never involved in FX options trading. To the contrary, when Mr. Martin worked on the CBOT nearly 25 years ago, he brokered futures (not options) on a regulated futures exchange *for the benefit of his clients* on an agency basis. RT 935-940. That experience is not transferable to the unregulated realm of principal-to-principal FX options trades – and suggesting otherwise to the jury is a further example of the government's disingenuity.[4] This case cannot go to the jury on Mr. Martin's belief that Mr. Bogucki committed a crime.

Similarly, the jury cannot convict Mr. Bogucki because Mr. Nesper believed Mr. Bogucki owed him a duty he did not owe. The lesson of *Litvak* is that where there is no duty as a matter of law, the purported victim's subjective belief is not just irrelevant, it is inadmissible. *United States v. Litvak*, 889 F.3d 56, 68-69 (2d Cir. 2018). The government's decision to elicit such testimony from Mr. Nesper in spite of this lesson once again bespeaks a conscious disregard for the government's truth-seeking function – especially given the undisputed facts that Mr. Nesper (1) knew that Barclays would trade in market-moving volume, and (2) never even requested, let alone reduced to writing, an assurance from Barclays that it would *not* trade.

Furthermore, the government's position that Barclays' trading was improper is irreconcilable with the testimony of the government's own witnesses. Both Scott Topiel and Sam Osterman testified there was nothing wrong with trading ahead of the unwind. RT 184; 731. As Mr. Osterman (who, unlike Mr. Bogucki, actually participated in executing the pertinent trades) explained, the purpose of Barclays' trading was not to drive down the price of volatility to harm or

---

[4] So, too, was prepping Mr. Martin without even showing him the Barclays' policy. For Mr. Martin, frontrunning may have been "a 'thou shalt not' kind of category thing to do" – but the government's bible for this case – the 2006 policy – said otherwise. RT 859.

disadvantage HP. RT 731-32. Rather, the purpose of the trading was to clear risk and find the depth of liquidity; that is, to find the price where there were buyers for options in quantity. Mr. Osterman further explained what actually happened: once Barclays started trading out of the risk it assumed from the first tranche, the price of volatility immediately adjusted downward, presumably because other banks realized HP was unwinding. RT 741. In the face of this evidence – and absent any evidence to the contrary – no rational juror could conclude that Mr. Bogucki committed a crime because of the way in which Barclays traded.[5]

It should not be lost in all of this that Mr. Bogucki neither placed the trades himself nor participated in the discussions among the traders about how to place them. In particular, Mr. Bogucki had no contact whatsoever with Tom Burrell, the lone Barclays employee who arguably tried (but failed) to depress the price of volatility for the purpose of disadvantaging HP. At most, Mr. Bogucki told Gugesh Guganeswaran to take perfectly appropriate steps to offer down the price of volatility to the market-clearing price. Accordingly, at the most basic level, no rational juror could possibly conclude that Mr. Bogucki participated in a conspiracy to defraud.

As counsel argued on Thursday, it is insane that the government continues to prosecute Mr. Bogucki on the theory that Barclays' trades were somehow unlawful. There were no rules that made the trades improper. Barclays owed no duty to HP. HP's representative knew (or, at the barest minimum, should have known) that Barclays would trade, and he took no steps to prevent Barclays from trading. When Barclays actually traded, it did so in a way that was consistent with industry norms, permitted by company policy, and designed to manage Barclays' risk, not to

---

[5] It is further misleading to suggest, as the government has repeatedly suggested, that Barclays "drove" down the price because Barclays benefited from a lower price by virtue of its short vega risk position. *See*, *e.g.*, RT 903, 906, 908, 930. For one thing, Barclays did not "drive" down the price; it traded out of the risk associated with the first tranche, which had the effect of reducing the price. RT 733. For another, HP's loss was not Barclays' gain. RT 765. For a third, Barclays' short position was extremely short-lived; as soon as HP transferred the second tranche, Barclays was very, very long. RT 926.

disadvantage HP.  Given these facts – none of which is subject to reasonable dispute – Mr. Bogucki cannot be convicted as charged.

Finally, if there were any doubt that the government is angling for a conviction at the expense of the truth, the government's objection to the Court's concern about due process takes care of that.  According to the government, due process is an "extraneous legal issue" that has no place in a court's decision whether to send a case to the jury.  Govt's Response at 5; *see also id.* at 21-22.  This is a startling proposition.  For one thing, it could not be less true that Mr. Bogucki waited until trial to raise the due-process issue, *see id.* at 21; to the contrary, he was shouting from the rooftops before the case was even filed.  *See*, *e.g.*, Ltr. from S. Hecker and D. Wikstrom to DOJ Fraud Section (Jan. 12, 2018), at 10-11.[6]  More importantly, the government's suggestion that a federal court should ignore a due-process abscess festering in the government's case and allow a jury to convict a defendant in spite of it is deeply odious to our system of criminal justice and the constitutional principles underlying it.  *See United States v. Ruehle*, No. SACR 08-00139-CJC (C.D. Cal. Dec. 15, 2009), RT 5195 ("I heard all the evidence present at Mr. Ruehle's trial and at the evidentiary hearings. . . . Based on the complete record now before me, I find that the government . . . has distorted the truth-finding process and compromised the integrity of the trial.  To submit this case to the jury would make a mockery of Mr. Ruehle's constitutional right to

---

[6] That letter, sent four days before the government secured an indictment, read in pertinent part as follows (emphases added): "In 2011, Mr. Bogucki's understanding of Barclays' trading activity was that it was designed to hedge *bona fide* risk associated with an anticipated transaction, was not intended to disadvantage HP, and was lawful and compliant with Barclays' policies.  And even today, we are not aware of evidence that the pre-hedging activity was not tied to Barclays' legitimate need to mitigate the significant risk associated with this transaction, which was one of the largest that any of the people involved—either at HP or Barclays—had ever seen.  We do not suggest that you must agree with the Global Code or Barclays' policies—though we believe they are reasonable.  *But it would be particularly unjust to bring individual criminal charges premised on conduct that was fully compliant with the policies then in place, as well as more restrictive policies adopted later.*  And you should certainly not hold Mr. Bogucki solely responsible for the Bank's pre-hedging given that it was widely known about within Barclays.  Pre-hedging was in 2011, and is today, a common feature of FX trading across Wall Street.  You may believe it should not be, in which case the proper course is to advocate for a legislative or regulatory fix; *but it should not cause the Department to bring a criminal case based on conduct that Mr. Bogucki had no reason to know in 2011, or even at the start of this investigation in 2016, was improper, let alone illegal.*"

1 compulsory process and a fair trial."). The Court should decline the government's invitation to
2 abjure its duty to ensure that Mr. Bogucki is fairly tried.

### II. There Were No Misrepresentations

The government's theory of supposed "half-truths" is part and parcel of its theory of supposedly improper trading. According to the government, Mr. Bogucki's statements to Mr. Nesper were simply a means to "further [the] scheme" of trading for the benefit of Barclays. Opp'n at 6. Indeed, the government goes so far as to argue that it need not prove that "'any particular false statement was made' so long as there is 'proof of a scheme or artifice to defraud, which may or may not involve any specific false statements.'" *Id.* (quoting *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003)).

For the reasons set forth above, however, no rational juror could find beyond a reasonable doubt that trading for the benefit of Barclays constituted a scheme to defraud HP. Accordingly, if the government means to argue that Mr. Bogucki's statements were fraudulent *because* they were part of that scheme, it follows that Mr. Bogucki must be acquitted of the misrepresentation counts as well.

But even if the government means to argue that the statements wewre independently false, the result is the same. When Mr. Bogucki told HP that Barclays traders were not touching the market on September 27 (Count 2), no reasonable juror could find that statement to be false or misleading. Within minutes of making the statement, Mr. Bogucki told Mr. Guganeswaran that "we can't touch the market" and discussed *other* means of managing Barclays' risk. Ex. 116T. The government presented no evidence that Barclays traded cable options in material volume on September 27. And the government's witnesses testified that a representation of the sort Mr. Bogucki made cannot reasonably be construed as a promise by a large global financial institution to abandon the FX market in perpetuity while a potential counterparty decides whether to trade with someone else. RT 224, 868-89.

When Mr. Bogucki told HP that market movements were attributable to factors like the S&P, a "stock market rally," and "resolution in Europe" (Counts 3 and 5), no reasonable juror could find those statements to be false or misleading. The evidence presented at trial was that Mr.

Bogucki was candid and forthright with HP about the trading Barclays did; his statements about other factors that contributed to changes in the price of optionality made clear that those factors contributed "in conjunction with" Barclays' trading.  Ex. 125 ("Again we aren't selling the specific option, but we are sold eur and gbp in combination over the last 10 hrs to take some of the inventory off and the rally in risk has caused vols to come a little lower *in conjunction with that flow*") (emphasis added); Ex. 139T.

When Mr. Bogucki told HP that Barclays was "long" on September 29 (Count 4), no reasonable juror could find that statement to be false or misleading.  Barclays *was* long the risk associated with the first tranche of options at that time (even though its overall options book was short).  Moreover, the evidence at trial was that Mr. Nesper was focused on Barclays' risk vis-à-vis HP's options, not Barclays' overall risk position, RT 279-82, and that he merely assumed (because he never asked) that Barclays was flat when Barclays purchased the first tranche.  RT 506-09.  The evidence further showed that Barclays' traders were not allowed to discuss Barclays' overall risk position, which was proprietary information, with clients.  Ex. 197; RT 698-99.  At any rate, the most that can be said about comments relating to the length or shortness of Barclays' risk is that they were subject to differing interpretations, not that they were criminally false beyond a reasonable doubt.

When Mr. Bogucki told HP on October 3 that he had "literally done everything on [his] end to tighten to as tight as what everybody would be possibly comfortable with" (Count 6), no reasonable juror could find that statement to be false or misleading.  The evidence at trial was that Mr. Bogucki undercut the very lowest price Mr. Guganeswaran told him he could offer HP for the second options tranche.  RT 753-54.

And when Mr. Bogucki told HP on October 4 that the market had not moved as much following the second tranche as it moved after the first tranche because Barclays was able to "lob out little pieces through our franchise and through the brokers and not have to run out and 'hit bids' and get aggressive with the market" (Count 7), no reasonable juror could find that statement to be false or misleading, either.  The evidence at trial was that Barclays was able to sell out the

risk of the second tranche gradually, whereas it had to be aggressive after the first tranche to sell out of the risk within 48 hours.  RT 708.  There is literally no evidence to the contrary.

As such, it makes no difference whether one views Mr. Bogucki's statements as purported misrepresentations or as evidence of a supposed scheme to defraud.  They were not misrepresentations (or "half-truths"), and they did not evince a fraudulent scheme.[7]  What the government misses in its hand-wringing over Mr. Bogucki's "intent" – *see* Opp'n at 7 ("At bottom, this case comes down to a single question: what was the defendant's intent?"); *id.* at 16 ("Intent is the key issue in this case.") – is that what Mr. Bogucki actually did simply was not a crime.

The tragic irony here is that the only misrepresentations in this case are those the government has made.  It was a misrepresentation to claim that Barclays caused the price of volatility to decline without even considering, much less examining, the information HP shared with other banks.  It was a misrepresentation to say that Barclays was uniquely aware of the unwind, when in fact nearly everything about the unwind was readily discernible from public information.  It was a misrepresentation to intentionally adduce testimony from Mr. Nesper that he was merely being "selective" about the prices he claimed to be seeing from other banks, when, as the government knew from Mr. Nesper's interviews and grand-jury testimony, those prices were outright lies.  RT 266-67, 454-54.  It was a misrepresentation to elicit testimony from Mr.

---

[7] They were also immaterial.  The only evidence of materiality the government adduced at trial was Mr. Nesper's *post hoc* testimony about what he would have done differently – and even that fell short.  *See, e.g.*, RT 282:

> Q. And if it were proven to be the case that Barclays at this point in time were, in fact, short on cable options, would that have had the capability of changing the spread that you would have agreed to?
>
> A. Yeah.  I mean, I don't even know what I would have done.  I would have ben upset.  But the spread would be meaningless at that point.  Like, I don't know what I would be paying them for if it wasn't for the risk they were taking.
>
> Q. Would you have paid them a spread if you had known if that were the case?
>
> A. No. I mean, it's hard to speculate on what I would have done, but I would have been upset.  I think I would have called people at higher levels in the bank to ask what was going on.  Yeah, I would have been mad.

1  Osterman suggesting that Mr. Bogucki had concealed "Barclays' activity in the market" from HP,
2  when in fact the government knew (from its own exhibit) that Mr. Bogucki told HP explicitly what
3  Barclays had done in terms of Barclays' trading activity.  RT 692-93, 755-57.  It was a
4  misrepresentation to adduce an expert opinion that a hedge occurs only after a risk is incurred, RT
5  947, when the government knows full well that "[h]edges are put in place to prepare 'in case' an
6  event happens."  Opp'n at 8.  It was a misrepresentation to suggest that Mr. Bogucki told HP to
7  wait to trade on September 30 because Barclays needed more time to pre-position, when the
8  relevant conversation makes abundantly clear that Mr. Bogucki told HP to wait because he could
9  not honor HP's requested price.  Ex. 139T.  It was a misrepresentation to imply, over and over
10 again, that Mr. Bogucki violated his confidentiality obligations when there is literally *no* evidence
11 that he (or anyone else) disclosed anything confidential to anyone.

12       The list goes on and on.  These observations about the government's repeated attempts to
13 mislead the Court and jury are not lightly made, nor are they merely an instrument of "zealous
14 advocacy."  Opp'n at 10.  Rather, they are a sad commentary on what, to undersigned counsel,
15 represents an unprecedented attempt by the Department of Justice to secure a conviction at the
16 expense of the truth.  At the end of the day, it would be a flagrant, reversible misrepresentation to
17 argue to the jury that it could convict Mr. Bogucki of wire fraud because Barclays traded in a way
18 that caused the price of volatility to decline, or because Mr. Bogucki said anything to Mr. Nesper
19 that was false or misleading when properly considered in context.

20       For all of these reasons, the Court should not allow this case to go to the jury.  Rule 29
21 exists to "avoid[] the risk that a jury may capriciously find [a defendant] guilty though there is no
22 legally sufficient evidence of his guilt."  *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir. 1993)
23 (citation and internal quotes omitted).  That is precisely the situation we find ourselves in here:
24 having refused a bench trial, the government now seeks to present a misleading and counterfactual
25 theory to the jury in hopes the jury will erroneously convict.  To fulfill the historical purpose of
26 Rule 29 as an "important safeguard to the defendant," *id.*, and to prevent a miscarriage of justice,
27 the Court should grant Mr. Bogucki's motion and enter a judgment of acquittal.
28

Dated: March 3, 2019          Respectfully submitted,

                                            KAPLAN HECKER & FINK LLP

                                            By   /s/
                                                 Sean Hecker
                                                 Derek Wikstrom
                                                 Alexandra Conlon
                                                 Abra Metz-Dworkin

                                            CLARENCE DYER & COHEN LLP

                                            By   /s/
                                                 Josh A. Cohen
                                                 Adam F. Shearer

                                            Attorneys for Defendant Robert Bogucki